1    UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
2                AT TACOMA

3

4   SYNTRIX BIOSYSTEMS, INC.,    )  Docket No. C10-5870BHS
                                 )
5          Plaintiff,            )  Tacoma, Washington
                                 )  March 14, 2013
6        v.                      )
                                 )
7   ILLUMINA, INC.               )  JURY TRIAL DAY 11
                                 )
8          Defendant.            )
    _____ )
9

10                   TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE BENJAMIN H. SETTLE
11     UNITED STATES DISTRICT COURT JUDGE, and a jury

12  APPEARANCES:

13  For the Plaintiff:        ALAN D. ALBRIGHT
                              Bracewell & Giuliani LLP
14                            111 Congress Avenue, Suite 2300
                              Austin, Texas  78701-4061
15
                              DEREK T. GILLILAND
16                            Nix, Patterson & Roach LLP
                              205 Linda Drive
17                            Daingerfield, Texas  75638-0679

18                            EDWARD CHIN
                              Nix, Patterson & Roach LLP
19                            5215 North O'Connor Boulevard
                              Suite 1900
20                            Irving, Texas  75039

21  For the Defendant:        DAVID B. ROSENBAUM
                              ERICK S. OTTOSON
22                            OSBORN MALEDON, PA
                              2929 N Central Avenue, Suite 2100
23                            Phoenix, Arizona  85012

24                            DIANE M. MEYERS
                              Graham & Dunn
25                            2801 Alaskan Way, Suite 300 Pier 70
                              Seattle, Washington  98121-1128

1

2   Court Reporter:              Teri Hendrix
                                 Union Station Courthouse, Rm 3131
3                                1717 Pacific Avenue
                                 Tacoma, Washington  98402
4                                (253) 882-3831

5   Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.
6

7

8

9

10

11

12

13                T A B L E   O F   C O N T E N T S

14                           VOLUME 11
                          March 14, 2013
15

16
    CLOSING ARGUMENTS                                  PAGE
17
        By Mr. Albright                                1808
18      By Mr. Rosenbaum                               1835
        By Mr. Gilliland                               1876
19
    Jury Retires to Deliberate                         1894
20
    Jury Verdict                                       1895
21

22

23

24

25

```
 1                    THURSDAY, MARCH 14, 2013 - 9:00 A.M.
 2       (Jury not present.)
 3            THE COURT:  Good morning.  Everybody ready to roll?
 4            MR. ALBRIGHT:  Yes, sir.
 5            MR. ROSENBAUM:  Yes, Your Honor.
 6            THE CLERK:  Please rise for the jury.
 7       (Jury present.)
 8            THE COURT:  Please be seated.  Good morning.  We are
 9   ready to proceed with closing argument.  You have your
10   instructions back there with you.  You can follow -- sometimes
11   the lawyers may make reference to an instruction, and so
12   you'll have them there to refer to.  The first to make an
13   opening argument is the plaintiff.
14       The plaintiff has the burden of proof on this, on its
15   claim, and has the right under the rules to proceed first, and
16   that will be followed by the defendant, Illumina, and
17   following that argument then the plaintiff again under the
18   rules has the right to have the last word.
19       So you may proceed.
20            MR. ALBRIGHT:  Thank you, Your Honor.  May I
21   approach?
22            THE COURT:  Yes.
23            MR. ALBRIGHT:  Thank you, sir.
24       May it please the Court:  Good morning.  We begin the
25   final chapter of a journey that has taken Dr. Zebala 16 years
```

1    to get to.  I think I speak for everyone to my left, counsel,

2    the parties, when I say thank you for your time and service

3    over the last couple of weeks.  We appreciate your patience,

4    we appreciate your attention.

5        If I could have the first slide, please.

6        Three weeks ago, we started.  Three weeks ago, we gave

7    opening arguments and both sides told you what their cases

8    would be about.  We, as the plaintiff, made certain promises

9    to you with respect to what we would show during the trial.

10   We believe we have delivered on every one of those promises,

11   and I am going to walk through now and remind you what we

12   believe the evidence has shown.

13       We told you right from the beginning that what Dr. Zebala

14   had done 16 years ago was something very special.  We believe

15   it was something that was revolutionary.  It resulted in the

16   '682 Patent.  We believe that Illumina has taken his idea and

17   used it, and that's why we've had this trial.

18       What have we proven?

19       Next slide, please.

20       We believe that we have shown you the evidence of

21   Dr. Zebala's inspiration.  For example, we've shown you the

22   prototype that he built.  This is the box of Kodachromes that

23   he took, the evidence of what he did.  This is the notebook

24   that you saw all the pages of.  They are all in evidence.

25       This is what he did after he left the lab.  This was how

1    he turned his ideas into patent applications.

2        We've put up the first day for you.  We believe it's very

3    important to make sure we all understand the timelines in this

4    case.  We believe one of the most important dates, if not the

5    most important date, is that of August 5, 1997 because that's

6    the date that Dr. John Zebala invented what became the '682

7    Patent.

8        The Court has told you that in this case, you are going to

9    have to answer a question about what day the invention is, and

10   the Court has told you this:  The day of invention is either

11   when the invention was reduced to practice or when conceived.

12       That's the date of conception, August 5, 1997, provided

13   that the inventor was diligent in reducing the invention to

14   practice.  Diligent means working continuously, though not

15   necessarily every day.

16       Ladies and gentlemen, this is diligence.  Imagine what it

17   took him to accomplish that by himself.  When I was in junior

18   high, they punished me by making me write down extra pages of

19   the dictionary.  I sat there for hours.  Think how long it

20   would take just to write that, let alone do the research; let

21   alone take from the notebooks, what all went into the

22   invention, and to try to make sure you get it absolutely

23   right, because if you ever do have to go to trial, someone is

24   going to go through every single thing you wrote and challenge

25   you on it.  It's not like it's a just cookbook process.

1    So what's the next date?  The next date is the date that

2  he filed the provisional application, December 1, 1998.  At

3  that point, with respect to the patent office, the line is in

4  the sand.  From then, there's a patent pending.  What does

5  Dr. Zebala do?  Now that he's got his idea in the patent

6  office's hands, now that he's protected when he started, he

7  can chase his dream.

8    His dream, after going through medical school, after being

9  a resident, his dream is to become an entrepreneur, to take

10  this idea of how to do a microarray, and he goes out and he

11  starts talking to companies.  One of those companies is

12  Illumina.  He reaches out to Dr. John Stuelpnagel, who's the

13  CEO of Illumina.

14    You heard in opening argument that it was a cold call.  It

15  absolutely was a cold call.  Dr. Zebala called him up and

16  said, I'd like to talk.  And Dr. Stuelpnagel said, your idea

17  sounds interesting, we need to do an NDA and then we can move

18  forward.  They sent him an NDA.  You've seen that in evidence.

19  I believe it's Exhibit 7.

20    Of course, what Dr. Stuelpnagel told you -- and you will

21  recall he was one of the witnesses that appeared by

22  deposition -- was that he doesn't remember talking to

23  Dr. Zebala.  He doesn't remember signing the NDA, but he

24  grudgingly admits that might be my signature.  He doesn't

25  remember getting a package of all the ideas that Dr. Zebala

1    sent.  What's our evidence?

2        If I could have the next slide, please.

3        Somehow, Dr. Zebala managed to keep the evidence after

4    however many years it's been, and we showed you the Fed Ex

5    package, Exhibit 257.

6        Next slide, please.

7        We showed you what was in there.  What's amazing about

8    that, what's amazing about what was in there is this isn't a

9    couple of drawings with stick figures on it saying hey, or

10   maybe something he blew up on a computer and said I'd like to

11   do a microarray like this; do you want to give me some

12   funding?

13       He sent them a blueprint of how to do the microarray, and

14   he sent it to them at a time that we know now that Illumina

15   had an alternate substrate committee -- maybe they didn't.  We

16   know that Dr. Dickinson was working to find an alternate

17   substrate.  They were searching for exactly this idea.  They

18   knew they were going to go fiberoptic, but they knew they

19   needed something better.  That's what he sent them.

20       And you heard -- that was the tape -- I made a joke, it

21   sounded like a 14-year-old boy.  He went through and explained

22   everything about his idea.  Imagine that 14, 16 years later

23   when he takes the witness stand and goes through and walks you

24   through and tells you what his ideas were, and then you hear

25   his voice from the year 2000 or the year 1999, and he's saying

1  exactly the same thing to these folks; exactly the same thing
2  about what his ideas were.
3      He uses the word "interstices."  We call them "voids"
4  here.  Exactly the same thing.  He talked about it being
5  continuous.  Everything you heard during the course of this
6  trial, if you want to go through that exhibit, I believe it is
7  Exhibit 330, you can hear again.
8      Next slide, please.
9      But Dr. Stuelpnagel tells Dr. Zebala, "We're going in
10  another direction.  We don't need your idea."
11      Next slide, please.
12      But then we learn through discovery in this case, we get
13  Dr. Dickinson's notebook, and what you see on the left, you'll
14  recall, is something that kind of looks like Dr. Zebala's
15  idea, only it turned out when we were talking to
16  Dr. Dickinson, that that's that little plastic piece that's
17  the size of a thumbnail, just the beginning of an idea, if
18  that.
19      What you see on the right is the image that Dr. Dickinson
20  put in his notebook.  It's just an image.  That image appears
21  two weeks, roughly, after Dr. Zebala sent Dr. Stuelpnagel the
22  blueprint.  If you look at the pages -- it's in evidence,
23  Dr. Dickinson's pages are in evidence.  If you look at the
24  pages prior to this, fiberoptic, fiberoptic, fiberoptic, bam,
25  this image.

1   Next slide, please.

2   Dr. Dickinson files for a patent application and he

3   includes that image.  But that's not even really what's

4   important.  What's amazing is that when he tells the patent

5   office why he ought to get a patent, and later gets a patent,

6   he tells them that this is new.  This is novel.  This is

7   different.  This is better than what Walt is doing.  It is

8   better.  It's different than fiberoptics.  That's what he

9   tells the patent office.

10   Next slide, please.

11   You will recall this.  The next date is when Sentrix --

12   it's October 31, 2001.  It's when Illumina trademarks the name

13   Sentrix, and that was a pretty amazing day of testimony.  We

14   first heard from Illumina witness, Dr. Barnard, who told us

15   it's an amazing story of coincidence.  We had a contest at

16   lunch.  We paid $100 to the winner, and we got the name

17   Sentrix, and we sent it to the committee.  That's the 1 in 8

18   billion chance.

19   Then we heard from the corporate representative on this

20   topic, and she said it took us several months, it was $1,000,

21   and the winning name from the contest was Genetrix, not

22   Sentrix.  What happened there?  Well, it went to

23   Dr. Stuelpnagel and the committee, and they changed it to

24   Sentrix.  And then in the same day of testimony, we heard from

25   Dr. Stuelpnagel.  He was asked a question and he said, my

1   memory of it is our committee came up with it, and it's just a

2   bad coincidence.  Three stories, three witnesses.

3       So let's move ahead.  We told you in opening, we committed

4   to you, that we would show you why the '682 Patent was a

5   really big deal and why it was important to the BeadChip and

6   to Illumina.  The BeadChip is released.  We now know that the

7   SAM, the fiberoptic product, was basically a bridge product.

8   It's what got Illumina from their start-up days through

9   2005 -- not that it ended in 2005 -- but roughly 2005 is when

10  the BeadChip really took off.

11      In 2005, there's no question that Illumina lost $144

12  million.  The next year, because of the BeadChip, they went

13  from earning $73 million to earning $184 million.  They were

14  on their way to finding a product that could compete with and

15  would ultimately overcome what Affymetrix was doing.  And it's

16  obvious why.

17      You've seen it (indicating), the SAM, the BeadChip.  It's

18  like everything in technology; it's smaller, faster, more

19  dense, better.  What was the foundation for that BeadChip?

20  You saw it earlier.  It's this patent, right here

21  (indicating).

22      Next slide, please.

23      So what happens next?  Dr. Zebala gets an email from an

24  old friend who says hey, you might want to look into this

25  product that Illumina is making.  He contacts Dr. Stuelpnagel.

1  Dr. Stuelpnagel says basically, have your lawyer talk to my

2  lawyer.

3       Next slide, please.  They go back and forth for a couple

4  of years without resolution.

5       Next slide, please.

6       The next event is that the '682 Patent is put into re-exam

7  in the patent office.  You've heard quite a bit about that.

8  Dr. Zebala and Syntrix had to fight for two years in the

9  patent office during this re-examination.  You know the

10  result; we won.

11       If I could have the next page, please.

12       That's the Certificate of Re-examination.  We showed the

13  patent office that the art that was cited against us during

14  the re-examination, including the Walt '540 Patent, did not

15  invalidate the '682 Patent.

16       Next slide, please.

17       What happens then in the timeline?  You saw this, at least

18  during our damages expert's case, but maybe during theirs as

19  well, you see the success that the BeadChip enjoyed.  There's

20  just really no dispute over this.  The numbers are what the

21  numbers are.  At this point, you see that the goal of the

22  '90s, of being able to beat Affymetrix, had been met.

23       Next slide, please.

24       In terms of dates, let's look at where Illumina was before

25  the BeadChip and after.  You saw before what the earnings

1    were.  You see what the earnings are for the BeadChip.  Over

2    $1.6 billion in sales.

3        Next slide, please.

4        Now, we told you in opening argument -- and again, I want

5    to make absolutely sure you understand that when we made

6    promises during the opening, we intended to prove them during

7    the trial, and that's the point of me walking back through

8    some of these slides.

9        We told you that Illumina had gotten their hand caught in

10   the cookie jar.  Next slide, please.

11       What they would do during the course of the trial, they

12   would tell you, we don't infringe.  Seriously, we mean it.  We

13   don't infringe.  But if we do infringe, the patent isn't

14   valid.  We mean that.  The patent isn't valid.  But if it is

15   valid, then we shouldn't ought to pay very much money for

16   having used it.  We told you that they would give you those

17   three excuses, and they have.  I am certain you'll hear

18   exactly those reasons in a little while when I sit down.

19       What did we do?  What did Syntrix do to prove our case to

20   you in terms of infringement?  We brought to you Dr. Metzker.

21   What did he do?  You will remember, it took a day of your

22   lives.  He went through each claim element, step-by-step,

23   step-by-step.  He went through the patent.  He went to --

24   basically, he stayed within the four corners of the claims of

25   the specification.

1    He showed you, just like if it was a recipe for a cake

2    that needed ten ingredients, he showed you that every

3    ingredient was there from the BeadChip with respect to Claim

4    1.  And then Claim 125, of course, is a method claim, and so

5    if we've proven Claim 1, and we have shown the methods of

6    Claim 125, we have proven both of those.  We relied on

7    Dr. Metzker, and he fulfilled every obligation he could have.

8         Let me go one slide forward, please.

9         Now, this is an example of the way Syntrix put on its

10   case, because we believe that the way to prove infringement,

11   the way to prove validity, the way to prove the technical

12   facts in this case is to point you to what's in the patent.

13        So for example, let's talk about a single layer of

14   particles.  I am not going to go through everything

15   Dr. Metzker did.  You've heard it.  We don't have time.  But

16   this is an example.  How did Dr. Metzker tell you that the

17   BeadChip -- how did he prove to you that it had a single layer

18   of particles?  Did he say, I am Dr. Metzker, and this is

19   Metzker on particles, or this is just my opinion, or this is

20   what someone skilled in the art?  No.

21        This is a slide that you saw where he went through and

22   pointed to you in precise places in the patent where there was

23   a foundation for single layer of particles, and then he went

24   through and compared it to the BeadChip.  We never strayed

25   from the context and the four corners, the fence, if you will,

1    that was the '682 Patent.

2        Next slide, please.

3        He also showed you this (indicating).  This was an

4    infringement slide.  This is the art of ten -- are all ten

5    ingredients in the cake slide.  He walked you through this.

6    This is a side view of the BeadChip (indicating), and he

7    showed you how every element was there.  He shows you the

8    particles.  He shows you the substrate.  He explained to you

9    the void regions in pink above and below (indicating).

10       He showed you the silicon oxide layer.  That's the SiO2

11   layer (indicating).  That's the binder that makes up the

12   gelled network (indicating).  He went through step-by-step,

13   and showed you infringement.  He showed you how they all

14   assembled together in this one slide to make a porous coating

15   under the definition that was given by the Court with respect

16   to the *Markman* instructions for Claim 1.

17       Next slide, please.

18       Now, we've proved infringement of Claim 1 and 125.  But

19   there's another side of the case, the invalidity side.  Let's

20   talk about that.  What did Illumina show you in their opening?

21   This was the board that they put up, and they told you, look

22   at this, look at all this stuff that was out there before and

23   after Dr. Zebala even came up with his invention.  Look at

24   this morass of other art; his patent can't possibly be valid

25   given this quantity of other stuff.

1    Let me add one date to this, if we can.  That's the
2  August 5th date we talked about, when we believe -- that's the
3  date of the invention.  Let's look at what Illumina kept on
4  their board in their validity case.

5    First, we see three patents disappear, that they talked
6  about.  Why did they disappear?  The question is:  Why were
7  they here in the first place?  They weren't part of Illumina's
8  validity case.  They only confuse you.  You heard the only two
9  patents the Court has told you could invalidate our patent are
10  the Walt '540 Patent and the Walt '410.  Those three patents
11  were completely irrelevant to the validity of the '682 Patent.
12  They were just a smoke screen.  Let's move forward.

13    The Walt research disappears.  The Walt research has
14  nothing to do with the validity of our patent.  It was just
15  research done in his lab.

16    Next slide, please.  Walt '540, Walt '410 are all that
17  matters.  Those disappear, they are not relevant.  Those were
18  Illumina presentations; nothing to do with validity, nothing.

19    One more slide.  This is kind of a big deal.  What you
20  just saw disappear, or what were known as the Chee --
21  C-h-e-e -- references, those disappeared between opening
22  argument and when Dr. Mrksich got on the stand to talk to you
23  about validity.  I don't know exactly why.  Maybe it's because
24  they had a decoding element that would show why the '540 and
25  '410 don't really validate.  I don't know why they

1   disappeared.  But what I want to make absolutely certain you

2   all understand is that none of the four Chee patents have

3   anything to do with whether or not the '682 Patent is valid.

4   Nothing.  Just part of the smoke screen.

5       One more slide, please.  Basically, everything after that

6   date disappears as well.  So what are we left with?  We are

7   left with the '540 Patent, from the opening argument that is,

8   of all of the things that they showed you that they intimated

9   might make it hard for us to enforce our patent, everything on

10  the slide, this is what we have left.

11      Then when we got to see Dr. Mrksich, we added one more,

12  which would be -- next slide, please.  Actually, let me go

13  through the '540 real quick.  Let me talk about the '540.

14  What do we know first?  We know first that the '540 was

15  reviewed by the patent office during the re-examination.  Let

16  me tell you what the Court told you in the jury charge about

17  that.

18      **New evidence not considered by the examiner -- that would

19  be the Walt '540 -- may carry more weight than evidence

20  previously considered by the PTO -- I am sorry.**  "New evidence

21  not considered by the examiner may carry more weight than

22  evidence previously considered by the PTO."  The Walt has now

23  been considered by the patent office.

24      "When a party attacking the validity of a patent" -- this

25  is the Court's orders -- "relies on prior art which was

1    specifically considered by the examiner" -- which was

2    specifically considered by the examiner, that's Walt during

3    the re-examination -- "during the prosecution of the

4    application leading to the issuance of the patent or during

5    re-examination of the patent, that party bears the burden of

6    overcoming the deference due to a qualified government agency

7    official presumed to have performed his or her job."  The

8    deference that's owed to the PTO when they re-examined the

9    '540 Patent.

10        Next slide, please.

11        You have it as an exhibit, ladies and gentlemen.  You'll

12   have the re-examination certificate showing that Walt was

13   considered.

14        Next slide, please.

15        Now, we are not coming in here and saying, hey, the patent

16   office looked at the Walt '540, you don't need to do anything,

17   we don't need to do anything.  To the contrary.  We had

18   Dr. Metzker take the '540 Patent and in the exact same way --

19   actually, I guess in the exact opposite way -- we went through

20   and said if this cake is here, what's missing?

21        Because remember, for the Walt '540, the Walt '410, for

22   you to answer that they invalidate our patent, you have to

23   find that those two patents have all ten ingredients for the

24   cake mix.  Not nine, not eight.  A B+ plus doesn't work for

25   invalidity, especially because the burden for invalidity is

1  clear and convincing evidence.

2      You remember the Court told you, we have to prove

3  infringement.  It's our burden.  That's why I get to go first.

4  The preponderance of the evidence.  The scales lean in our

5  favor.  Validity, because it has been reviewed by the patent

6  office, is a clear and convincing standard.

7      Dr. Metzker went through and showed you several elements

8  that were missing from the '540 Patent as well as the '410 for

9  both Claim 1 and Claim 125.  If they are missing any

10  ingredient, they fail.  And they weren't just missing one

11  ingredient.  They were missing the substrate.  They are

12  missing the continuous porous coating, substantially uniform

13  thickness.  The '540 Dr. Metzker showed you has none of those.

14  But we weren't done there.

15      Next slide, please.

16      During opening, you heard that if we try to stretch our

17  patent to cover the BeadChip, it's invalid.  Our patent is

18  invalid because the Walt '540 covers the BeadChip.  Our patent

19  can't cover it also.  If we make it look like that, if we

20  stretch it, then we bump into the '540 and the '540 was first.

21      But what did Dr. Walt, the inventor, tell you?  I asked

22  him, "Does the BeadChip use fiberoptics?"  He looked at me

23  like I was goofy.  "Of course not, of course it doesn't use

24  fiberoptics."  "Does the BeadChip use an optical signature for

25  decoding?  "No, it doesn't."

1        I went through with you, claim by claim and asked

2   Dr. Walt:  "Does this claim of the '540 require an optical

3   signature for fiberoptics or both?"  And he said "yes" to

4   every one of those.

5        Dr. Walt admitted that the '540 doesn't cover the

6   BeadChip, and that's really an important admission in this

7   case for another reason because you remember when

8   Dr. Stuelpnagel was asked about whether or not he thought the

9   '682 Patent covered the BeadChip, he said, of course not.

10  It's covered by the Walt technology.  And we now know from

11  Dr. Walt that the '540 doesn't cover the BeadChip.  You all

12  know it doesn't cover because you all see that the fiberoptic

13  SAM and the BeadChip are completely different products.

14       I would like to show the video that the jury saw during

15  the earlier course of the trial, Your Honor.  If we can just

16  stop for a second.  Obviously you see the SAM on the left,

17  just for the record, and you see the BeadChip on the right.

18       If we could proceed, please.  (Video playing.)  You can

19  stop it right about there, please.

20       A picture is worth a thousand words.  You look on the

21  left, you see the fibers, you see the fiber cladding.  You see

22  it's necessary because you need to get light to travel through

23  the fiberoptics in this product.  I saw some of you hold it up

24  to the light when you passed it around.  You can see through

25  it.  You can't see through the BeadChip.  You don't need to.

1  It doesn't use fiberoptics.  It's a solid flat piece of
2  silicon.

3      Can we keep going, please?  (Video playing.)

4      Now, if we get to right about there (indicating), there is
5  no question that if you get at just the right angle, you will
6  see that both of them have wells that beads go into in a
7  random assembly.  That's where the similarity stops.  It's
8  like taking a picture of a jumbo jet and a Cessna 182 from
9  about 10,000 feet up and saying, look, they are both planes,
10  they look the same.

11      If we can keep going, please.  (Video playing.)

12      Okay.  Let me point out for you exactly what I just said.
13  You see the optical fiber cores (indicating) missing from the
14  BeadChip.  You see the optical fiber cladding (indicating)
15  nowhere in the BeadChip.  What do we see on the right?  You
16  see the rigid coating of silicon dioxide, the polymeric
17  binder.  You see the silicon substrate.  These two products
18  are nothing alike.

19      Can we keep going, please?  (Video playing.)  Let's just
20  cut ahead.  I am a little bit behind, and I want to catch up.
21  If we can go to next slide, please.

22      The '540 Patent doesn't invalidate the patent.  It just
23  doesn't.

24      Re-examination, Dr. Metzker, Dr. Walt.  Let's talk about
25  the '410 which got added during the course of the trial to the

1   time -- I am going to add the Walt '410 to this slide.

2   Now, the first thing you'll notice is that it comes after the

3   date of conception, after what we believe is the date of

4   invention.

5       If we could keep going, please. (Video playing.)

6       Actual reduction to practice -- keep going, please -- the

7   other reduction to practice when we filed the patent

8   application.  And then what the green bar shows is what the

9   Court requires you to find that we did our due diligence, and

10  I won't go back over that.  You heard Dr. Zebala's testimony

11  about what he did during that period of time.

12      Let's talk about the Walt '410.  What did Walt say about

13  the '410?  I asked him:  "And the reason that the '410 Patent

14  was filed more than a year later was because Illumina wanted a

15  patent that would capture additional claims, right?"

16          "Answer:  I would say that's actually putting --

17  that's not correct.  I would say that it was really to capture

18  the full intent -- it was really to capture the full intent of

19  the technology as we had described it in the '540 Patent, but

20  to describe it in a much clearer, more broader context."

21      I asked him:  "Did you add anything -- did your lawyers

22  add anything to the '410 when you filed it?"  And he said:

23  "No.  We just wanted to make it clearer."

24      Then the next slide, please.

25      He said it's a continuation-in-part, and the

continuation-in-part, he said, describes and refines the
description that's in the parent patent.  That's the '540.
The '410 doesn't invalidate the '682 Patent.  Dr. Metzker
walked you through that as well.

Could I have the next slide, please?  I have already
talked a little about that.  These are the pictures that we
made of the different standards of proof that we believe the
Court told you about.

Next slide, please.

Now, Illumina has the burden of proving invalidity.
Dr. Metzker, on the witness stand, you heard Dr. Metzker on
the witness stand explain to you why ingredients were missing.
But it's their burden, at a clear and convincing standard, to
establish that every one of those elements you see on the left
are in the '540 and the '410.  Did they walk you through them
and explain to you why those ingredients are in there or how
they are used?

They said, here's our list.  You have the patents, good
luck.  You can go find them yourselves.  Don't you think --
and probably the most important thing you can do when you get
back to the jury room is just hunker down and use your common
sense on all these questions.  Don't you think if you are
using your common sense, that if Illumina had evidence to
prove this, that they would have walked you through it?

Don't you think that if they could have shown, for

1  example, that the Walt Patents had a continuous element or a

2  porous coating, that they would have been screaming from the

3  bleachers about it?  They would have walked you through it for

4  a day and made sure you understood where every element was in

5  the '540 and the '410.  But they didn't.  They just said all

6  the ingredients are in there.  Go look it up, if you want to.

7      Next slide, please.

8      My advice -- and it's just my advice -- is that you all

9  spend about as much time deliberating invalidity as the

10 defendant spent putting on their case for invalidity, which

11 consisted of that list of ingredients they hoped you would

12 find if you took the time to go look up the '540 and the '410

13 Patent.  That was their invalidity case.

14     Next slide, please.

15     This is the final statement of my presentation, the

16 damages phase.  Again, burden of proof on us for infringement.

17 Burden of proof on them for invalidity.  Burden of proof again

18 by preponderance of the evidence, slightly more with respect

19 to damages.  That's our burden, and we accept it.

20     We presented to you Dr. Ratliff who explained to you how

21 it was that he came up with the █ percent number, and both

22 experts agree that the starting point was the Tufts license of

23 █ percent.  Mr. Ratliff told you that Dr. Stuelpnagel said

24 during the deposition that when Tufts started bargaining, they

25 wanted █ percent; they settled for █.  I pointed out to you

1    that that █ percent that they have gotten in terms of the

2    royalty rate, that they received a very substantial amount of

3    money on, and was a very good deal for Tufts, but that wasn't

4    all they got.  They got an extraordinary number of shares.

5        They were conservative.  They sold them virtually right

6    away and they made almost $8 million on them.  That's not

7    nothing; that's in addition to the royalty.  That's whether or

8    not they'd ever have gotten a royalty; that's if Illumina had

9    stopped making anything to pay royalties on, they still had

10   the stock.

11       But what did we establish?  We established that if Tufts

12   had kept their stock, today it would be worth about $54

13   million.  And yet, Illumina's expert wants to tell you, don't

14   look behind that curtain.  All Tufts got was █ percent.  The

15   stock was completely unrelated.  Really?  Your common sense

16   tells you that, what was it, 10 percent of the company, or

17   5 percent, some enormous amount was completely unrelated to

18   what Illumina was willing to give and what Tufts demanded that

19   they get?  It doesn't make any sense.

20       But it's important that you all understand that big

21   picture because what Illumina is going to tell you is that for

22   Dr. Zebala and Syntrix, we're trying to get two times what

23   Tufts got, twice what they got.  That's just not fair.  That

24   is not right.  You have to look at everything Tufts got and

25   decide, with respect to that package, that's the relevant

1   question for determining what the reasonable royalty rate

2   ought to be.

3       What we are asking for is that Illumina share █ percent of

4   what they have made on the BeadChip with Dr. Zebala and

5   Syntrix because of his contribution to the BeadChip itself.

6       If I could have the next slide, please.

7       Again, a picture is worth a thousand words.  Sales of the

8   BeadChip, sale of the SAM.  We can talk about the fact that

9   SAM was a great product in 2003.  It may have been.  We can

10  talk about the fact that it had good margins, all the way

11  through until the time Illumina just quit selling it.  Maybe

12  it did.  But the evidence -- I was going to say it's black and

13  white -- the evidence is green and orange, that the BeadChip

14  was a phenomenal success for Illumina.

15      Next slide, please.

16      We have talked a little bit about this one.  It also

17  allowed BeadChip and Illumina not only to compete with

18  Affymetrix -- and remember what we heard, at the time Illumina

19  was starting, there was really only one Goliath in the

20  industry, and it was Affymetrix, and that didn't change

21  through 2000 to 2005.  After 2005, with the BeadChip, the

22  world changed a lot.

23      If I could have the next slide, please.

24      Quickly, I am going to walk through this.  This is the

25  reasoning that Mr. Ratliff used.  He started with the Tufts

1    license.  He considered all these factors, including the stock

2    compensation that Tufts got.  He believed, based on all of

3    those factors, it went to ▮ percent.  He then said, I am going

4    to be true to the Tufts logic.  Tufts allows for a stacking

5    provision to reduce this by ▮ percent, and he did.  He was

6    faithful in terms of the amounts.  He was faithful in terms of

7    the reductions.  He reduced it to ▮ percent.

8        Then he does something that's very interesting, because

9    there were a substantial number of products that you saw.  We

10   talked about arrays -- the arrays are the BeadChip.  We talked

11   about the assays, the Infinium, the GoldenGate.  We talked

12   about the iScan, the reader.  Do you remember that?  We talked

13   about the software that went with all the stuff.

14       The software is free, basically.  But we talked about

15   everything that went with it, and those sales were in the 3

16   and $400 million range, and he didn't include those in the

17   base.  He left those out of the base.  That was the discussion

18   we had.  I am sure you'll talk about, for many months when you

19   get home, about convoyed sales and how interesting that is.

20       He left those out.  But then he said, I am going to adjust

21   up ▮ percent, and that's how we get to ▮ percent.  The extra

22   percent is to scoop up, which the *Georgia-Pacific* factors

23   allow for, is to make the rate take into account the

24   additional sales that were caused by the BeadChip.  And

25   remember that, because it's important for Claim 125, which is

1    the method claim.

2        Remember that we talked about, could you use the iScan

3    without the BeadChip?  Nope, it wasn't made for the SAM.  It's

4    a reader.  It wasn't made for anything else.  The only thing

5    you can do -- the only use it has is to work with the

6    BeadChip.  There's no nonconforming use; it's a big

7    paperweight.  What's interesting is it works in reverse, too.

8    You can't use the BeadChip without the scanner.  The same with

9    the assays.  We asked:  Do the assays work on anything else

10   other than the BeadChip?  Nope.  GoldenGate?  Nope.  Infinium?

11   Nope.

12       Does the BeadChip work without the assays?  Again, I got a

13   goofy look from the witness stand.  No, silly, of course the

14   BeadChip can't work without the assays.  That's why they sell

15   them in one package.  You can't use any of those products

16   without using the others.

17       So we come to the final slide.  This is the final slide.

18   The total accused sales are about $1.6 billion.  We suggested

19   a reasonable royalty rate of █ percent, and you see the math.

20       But before I sit down, I am going to take about two more

21   minutes of your time and remind you, again, the right to a

22   jury is protected in the Constitution.  The value of the jury

23   is that you bring your common sense to address complex

24   questions and consider a lot of evidence.

25       You have to be sitting there thinking, I just sat through

1  three weeks where I had one incredibly credentialed person

2  tell me one thing, and someone else tell me just the opposite,

3  over and over.

4      So ultimately, you are the judges of the credibility of

5  the witnesses, the believability of the evidence.  That's your

6  job.  I will wrap it up by pointing this out.  Let's look at a

7  couple of the witnesses that you'll have to consider the

8  credibility of.

9      You have Dr. Zebala.  He was on that witness stand for a

10  couple of days.  I think he told you the story over three or

11  four hours of how he gave birth to the '682 Patent and

12  everything it took for him to get there.

13      He told you how he couldn't convince anyone to take it, a

14  deal fell through with ABI.  But he didn't quit.  He started

15  his own business just a few miles down the road, and he's

16  flourished in that business.  He's still running it today.

17      You heard him cross-examined by opposing counsel for

18  hours, and that's certainly Illumina's right to do.  He

19  withstood any question with dignity, and he provided honest

20  answers.  You get to judge his credibility.  Compare that to

21  Dr. Stuelpnagel, former CEO of Illumina.  There's no question

22  that in 2000, Illumina was searching for an alternate

23  substrate; all the records show that.  They were hunkered

24  down.  They were trying to release a fiberoptic product that

25  they knew needed something else.

1    What did he tell you about what happened?  I don't

2  remember John Zebala.  I don't remember getting a package.  I

3  don't remember signing this.  Okay, maybe that's my signature.

4  We are going in a different direction.  You get to evaluate

5  the credibility of the witnesses that have appeared in this

6  case.  The road to the courthouse has taken 16 years, all of

7  it in sweat equity by Dr. Zebala.

8    I thank you for your time this morning.

9        THE COURT:  I think a 10-minute recess will be

10  adequate here before we hear from Illumina, and then that will

11  probably take us straight through; we'll not take an

12  additional break after that.  So we'll complete the oral

13  argument in the next session.

14    As you go to the jury room and out in the hall and so

15  forth, please do not discuss the case yet.  We are almost

16  there where you not only may, but you must, have the

17  responsibility to discuss the case among yourselves.

18        THE CLERK:  All rise.

19        MR. ROSENBAUM:  Your Honor, will Illumina also get a

20  rebuttal with respect to our counterclaim?

21        THE COURT:  We hadn't talked about that.  It occurred

22  to me that because there is the counterclaim, what is your --

23        MR. ALBRIGHT:  I have never seen it done.

24        MR. GILLILAND:  It's highly unusual.  I have never

25  seen it done.

1       THE COURT:  I haven't either.  It would be the first

2    for me.  I have had many cases where there is a counterclaim

3    in it.

4       MR. ROSENBAUM:  Your Honor, I would like the

5    opportunity.  With the counterclaim, it's just parallel with

6    their affirmative claim.  I think the party with the burden of

7    proof on the claim has the opportunity for rebuttal.

8       MR. GILLILAND:  Your Honor, their counterclaims are

9    basically direct responses to our claims, so I don't really

10   see it as necessary, any different than it would be in any

11   other case with an affirmative defense.

12      THE COURT:  The Court is going to deny the request.

13    (Morning recess.)

14      THE CLERK:  All rise.  Court is back in session.

15   Please rise for the jury.

16    (Jury present.)

17      THE COURT:  Please be seated.  Mr. Rosenbaum.

18      MR. ROSENBAUM:  May it please the Court, ladies and

19   gentlemen of the jury:  I want to thank you for your careful

20   attention over the last three weeks.  Something has been

21   eating at my core, something has been in the pit of my stomach

22   for the last three weeks, and I am glad I have a chance

23   finally to speak to you directly about it.

24    In opening and in closing, Syntrix has accused Illumina of

25   theft.  They have accused Dr. Dickinson of theft.  They have

1   accused John Stuelpnagel of theft.  They have accused Bob Kain

2   of theft.  They accused Dr. Black of theft.  Theft of an idea,

3   they say, that got Illumina unstuck, that enabled Illumina to

4   go from SAM to BeadChip.

5       So I've been waiting for three weeks to hear, what was

6   that idea?  What was the technological roadblock?  What was it

7   in the package sent to John Stuelpnagel that allowed a light

8   bulb to go off, that allowed Illumina to say oh, oh, now we

9   see we can go from SAM to BeadChip?

10      You never heard it.  There was nothing in that package

11  that would have allowed Illumina to go from SAM to BeadChip,

12  and I will talk about that in some more detail.  So we were

13  just criticized for this timeline because the timeline

14  includes that lot of information that doesn't have to do with

15  our invalidity case.  That's right.  All of the prior art, the

16  publications, the patent applications that we went through in

17  opening and that you heard about in evidence were to rebut the

18  central theme of their case that there was something new that

19  Dr. Zebala invented, that somehow allowed a light bulb to go

20  off in Illumina.

21      What the prior art showed, the blue colors, which weren't

22  even Illumina statements, was that already in the field people

23  were using slides for DNA arrays, people were using particles

24  for DNA arrays.  The Chee patent that they say we removed,

25  that was an Illumina patent that you saw that talked about

1   putting beads in slides.  That's what that was for.  Yes, our

2   invalidity case is limited to the two patents, the two Walt

3   patents, that are on the BeadChip for which Illumina continues

4   to pay Tufts for royalties; that's the invalidity case.  The

5   rest of this chart is to show that this copying, this theft

6   theory that's the heart of their case, doesn't stand up.

7        So this is not a case about theft or copying, or it

8   shouldn't be.  It's a case about whether Syntrix can prove

9   that the BeadChip on the left contains each and every element

10  of Claim 1 of Dr. Zebala's '682 Patent.  His -- and you didn't

11  hear any of this in closing -- his gelled network, his

12  aggregation of particles linked together to form a porous

13  coating three-dimensional network, I didn't hear the phrase

14  three-dimensional mentioned at all in opening or closing.

15       These two products are different.  BeadChip is not the

16  porous coating, the gelled network invented by Dr. Zebala.

17  And information in a package describing that is not what the

18  technological key is to going from SAM to BeadChip.

19       And because it's not, because the '682 Patent describes

20  something very different, Dr. Zebala can leave this courtroom

21  with a valid patent.  We are not asking you, please invalidate

22  his patent.  If you limit his patent to what it really is,

23  which is this three-dimensional gelled network, he can leave

24  the courtroom with a valid patent and maybe he can interest

25  somebody in it.  Maybe he can make something of it.  Maybe he

1    can profit from it, but he can't profit from the BeadChip

2    which he didn't invent.

3        If you twist this language to cover two-dimensional beads

4    separated from each other in individual wells, then you have

5    to find the patent invalid because that's the Walt '540 Patent

6    and the '410 Patent, patent applications both filed before the

7    '682 Patent.  But that's not what his patent describes, not

8    BeadChip.

9        What his patent describes, and what Dr. Zebala described

10   in that multi-media CD that you heard played, and it's

11   Exhibit 311, with the text, what the patent describes and what

12   was in that CD is this porous coating.  What he described was

13   a porous coating with particles packed together to increase

14   signal strength 100-fold, 400-fold.

15       The BeadChip does the opposite.  It doesn't increase

16   surface area to increase ligand density and therefore signal

17   strength.  It does the opposite.  Anybody receiving that

18   package, had they studied it, would have said that's not where

19   we are going.  We have individual beads in individual wells.

20   We don't do an aggregation of particles linked together in a

21   three-dimensional network to increase ligand density and

22   signal strength.  So that's what the case is about.  Does

23   Claim 1 cover BeadChip?  If so, that it's that broad to cover

24   individual beads randomly assembled in individual wells, then

25   it's invalid.

1    So let me go back to what the case is not about.  This

2  theft theme, this copying theme, an issue that has nothing to

3  do with whether or not Claim 1 is infringed.  You were

4  instructed by Judge Settle that you may not consider this

5  evidence of alleged copying in deciding whether or not

6  Illumina's BeadChip products infringe Claim 1.

7    It's only relevant, if at all, to this inducement element

8  part of Claim 125.  And as you've heard, Claim 125 isn't even

9  an issue if there's no product that infringes Claim 1.  So

10 this whole copying story, which is the heart of their case,

11 you may not consider in determining whether there's an

12 infringement of Claim 1.

13    This isn't a copyright case.  This isn't a trademark case.

14 This isn't a breach of a nondisclosure agreement case.  It's a

15 patent case.  The only issue that matters is whether BeadChip

16 contains a porous coating of particles aggregated together in

17 a three-dimensional network.

18    If it is, it doesn't matter if Illumina is aware of the

19 patent for Claim 125.  It doesn't matter that you are aware of

20 patents that you don't infringe.  You heard that in 2007,

21 Dr. Stuelpnagel gets a call from Syntrix.  He says he looked

22 at the patent, and it was clear to him Illumina doesn't

23 infringe.  We don't have this porous coating.  We don't have

24 particles linked together to form a three-dimensional network.

25 In his own words, he said it's super clear.

1    So knowledge of the patent matters if you are infringing

2    for Claim 125, but it doesn't matter that you know about a

3    patent that you don't infringe.  So what really matters for

4    infringement of Claim 1, how can Syntrix prove that BeadChip

5    has each and every element of Claim 1?

6        Next slide.

7        What BeadChip does, just like SAM before it, is put into

8    practice the revolutionary idea that Dr. Walt came up with in

9    1996.  His epiphany, the idea that you could precoat beads

10   with different DNA strands or with other probes -- it doesn't

11   have to be DNA -- and allow them to randomly assemble into

12   wells so that in a single test area, you could at the same

13   time, with one sample, test for multiple things at the same

14   time.

15       That was his revolutionary idea that Dr. Zebala didn't

16   even know about when he was working at Children's and writing

17   his patent application.  Before we talk about the specific

18   elements of Claim 1, I want to talk about the forest, not the

19   trees, the big picture.

20       Both experts agreed, Dr. Metzker and Dr. Mrksich, that the

21   Zebala patent, the '682 Patent, does not cover the random

22   assembly of beads-in-wells, does not cover random assembly of

23   beads-in-wells.  How could it?  Dr. Zebala didn't even know

24   about it.  He didn't know -- he didn't know about Dr. Walt's

25   publication in analytical chemistry when he was working on his

1   porous coating idea.

2        So to prove infringement, Syntrix must prove to you that

3   this BeadChip, individual beads randomly assembled in

4   individual wells, is covered by the patent for his

5   three-dimensional porous coating of particles aggregated

6   together.  He needs to show that his patent for that coating

7   on the right covers individual beads assembled in individual

8   wells on the left (indicating).

9        So, in opening, and they did it again, you heard Syntrix

10  counsel say, well, if you hold it in a certain light -- I

11  think in opening they said if you open your mouth a certain

12  way -- they might look similar.

13       Well, really?  That's SAM (indicating).  That's BeadChip

14  (indicating).  Really, you have to open your mouth a certain

15  way, and in the right light in order to see that they are

16  similar?

17       You heard Dr. Barnard testify.  Even he can't tell them

18  apart unless you have some kind of a measurement in the

19  scanning electron microscope image that lets you know, okay

20  that's a 2 micron bead or a 1 micron bead, and we know it

21  can't be SAM because SAM has a 3 micron bead.

22       That's how close they are.  They both implement Dr. Walt's

23  revolutionary idea that changed the science that's changed the

24  field of random assembled beads in individual wells.  That

25  idea that Dr. Zebala knew absolutely nothing about.  That idea

1   that got Dr. Walt elected to the National Academy of

2   Engineering, that revolutionary idea that created Illumina.

3   That's what created Illumina.  Random assembly of

4   beads-in-wells.

5       A revolutionary idea that perhaps made Dr. Walt a little

6   wealthier than some of his colleagues at Tufts, but a

7   revolutionary idea that should not earn Dr. Zebala ███████

8   because he didn't invent it.

9       So in opening and in closing, Syntrix has tried to

10  distinguish SAM from BeadChip, and this is the key to their

11  copying story.  And I am going to run through the things that

12  they said were in that package to Dr. Stuelpnagel that allowed

13  SAM to go to BeadChip, all right.

14      Remember, what we are looking for is some kind of

15  technological insight, some light bulb that goes off that

16  allows the scientists and Ph.D.'s at Illumina, brilliant

17  people, to say, oh, we can put beads-in-wells on a flat

18  surface.  Here's what they said in opening, that Illumina was

19  stuck in group think.  Did you hear any evidence of the group

20  think or how they were stuck?

21      They said BeadChip was necessary to get the IPO going to

22  raise money from the investors.  That's what they said in

23  opening.  You have the IPO in evidence, the prospectus.  It's

24  all about SAM.  It's all about SAM.  Not a word about

25  BeadChip.

1    They said in opening that Dr. Zebala's package sent

2    Illumina's patent applications in a new direction, in a new

3    direction.  Well, we'll talk about that as well.  You heard

4    Mr. Albright say that they made promises.  Well, these were

5    promises, these were representations, these were statements

6    that they made, and they haven't proved a one of them.  They

7    haven't proved a one of them.

8    Illumina wasn't stuck.  It was moving forward with SAM,

9    the revolutionary product, a product that changed the science

10   of genomics.  A product that was used for 60, 70 percent of

11   all the work done in HapMap.  It's what identified the 5

12   million human genetic variations or SNPs.  It's what created

13   the opportunity for BeadChip, because now you needed more

14   beads-in-wells because you needed to test for more genetic

15   variations.

16   So now there's a slide with 140 million beads-in-wells

17   that can test for all of those 5 million variations in four

18   different sample regions.

19   It was Dr. Walt's beads-in-wells technology that allowed

20   that advance.  There was nothing in the package on porous

21   coating that was sent to Dr. Stuelpnagel.

22   So what was Illumina stuck on?  You also heard that while

23   Illumina was working diligently on bringing SAM to market, it

24   was already looking at flat planar substrates.  It had its

25   alternate substrate project.  That turned into the Odyssey

1  project and eventually BeadChip.  We heard nothing about what

2  was in the Stuelpnagel package that somehow held this

3  alternate substrate project move to BeadChip.

4      So what did they say got Illumina unstuck?  What was it

5  that Dr. Dickinson, who you saw, that Dr. Barnard, who you

6  saw, that Bob Kain, who you heard from, what was it that they

7  needed to learn to move from BeadChip?  You never heard it.

8      So one of the things Syntrix has argued is the name, the

9  name Sentrix used for SAM is similar to Syntrix, and so they

10  say that somehow that was a theft.  We don't buy that.  You

11  heard testimony that it was actually a naming contest.  You

12  heard candid testimony.  You heard Dr. Barnard recall it was

13  $100, the prize.  He didn't conform his testimony to that of

14  other witnesses who said it was $1,000.

15      But leave that aside.  How does that unstick group think?

16  How is using a name a technological advance that allows you to

17  get from SAM to BeadChip?  Of course it's not.

18      What else did they say was copied?  They said that the

19  substrate language in Dr. Dickinson's February 2000

20  provisional patent application was copying from Dr. Zebala's

21  provisional application.  You saw that language.  It looked

22  nothing like this (indicating) with a listing of glass

23  silicon, germanium, Ge, GaAs, et cetera.  It looked nothing

24  like the substrate language that Dr. Zebala himself had lifted

25  wholesale from the Affymetrix patent.

1    Can you imagine what my stomach felt like when they

2  accused Dr. Dickinson of copying this language, when his

3  language looks nothing like this, and it's the very language

4  that Dr. Zebala himself copied from the old Affymetrix patent?

5  That didn't get the scientists at Illumina unstuck from their

6  supposed group think.  Illumina was already working, already

7  working on flat planar substrates long before that package to

8  Dr. Stuelpnagel.

9    This (indicating) is Dr. Walt's '410 Patent filed

10  16 months before the package to Dr. Stuelpnagel, 16 months

11  earlier, and he talks about using flat planar surfaces, not

12  fiberoptic bundles.

13    What else do we know that was already going on in Illumina

14  before that package comes in?  In the alternate substrate

15  project in June of 1999, a half a year before that package

16  comes in, Illumina is describing an array of array on a chip

17  and talking about using glass and silicon, not fiberoptics.

18    In fact, a year before that, Dr. Barnard in his job

19  interview says, let's put it on a planar surface without light

20  conduits.  They weren't stuck on anything.  They were already

21  working on this long before the package is sent to John

22  Stuelpnagel.

23    What else did they say besides the planar substrate?

24  Well, the idea of using a microscope slide shape, because

25  that's in Dr. Dickinson's provisional application.  That was

another technological roadblock that somehow got Illumina
unstuck, the idea of using a microscope slide shape, which
scientists had been using since the days of Louis Pasteur.
Really?  You think the scientists and Ph.D.'s at Illumina
didn't know about microscope slides?

You heard Bob Kain testify, Steve Barnard testify.  They
were already working with microscope slides.  Bob Kain, in his
prior work at Molecular Dynamics, was doing DNA microarrays in
the shape of microscope slides.  So that's not the idea that
gets the group think unstuck.

You saw Bob Kain's laboratory notebook and Todd
Dickinson's laboratory notebook where they both reflect that
Bob Kain suggested, hey, how about a microscope slide shape?
And that was for the gene expression slide, not the BeadChip.
So there was no light bulb that needed to go off.

But besides, look at the '682 Patent.  It doesn't even
tell you to use a microscope slide shape.  You saw what
Dr. Zebala was working with in his lab.  It's not a microscope
slide shape.  What does the '682 Patent tell you?  You should
use any convenient shape, a disk, a square, a sphere, a
circle.  It doesn't even suggest a microscope slide shape.

Where did Dr. Zebala get that language?  He took that,
once again, almost wholesale, from an Affymetrix patent.  So
the scientists at Illumina, who of course are very familiar
with the named competitor Affymetrix, a light bulb goes off in

1   a package that merely repeats language that's already in a

2   Affymetrix patent?  Of course not.  The heart of their case,

3   the theme of their opening, the theme of their closing,

4   doesn't hold up.  There was no group think that got unstuck.

5       The last similarity that they talked about is this

6   checkerboard pattern.  Everybody was using checkerboard

7   patterns.  That's how you did a DNA array.  This is in Todd

8   Dickinson's lab notebook from September of 1999, months before

9   the package goes to John Stuelpnagel.  So now we hear

10  criticism, the Affymetrix patent, published in 1995,

11  checkerboard patterns.  But let's go back to the prior slide,

12  Todd Dickinson.  They criticize that as not being good enough

13  because it was just the shape of the size of a thumbnail.

14      What is the prototype, the size of a thumbnail?  That's

15  good enough for Dr. Zebala to claim credit for BeadChip, but

16  not good enough to show that Illumina was already working with

17  checkerboard patterns.  I don't think so.  It doesn't hold up.

18  No one was stuck on anything.  There was no unsticking

19  material in the package sent to Dr. Stuelpnagel.

20      So in opening, Mr. Gilliland said Dr. Zebala sends his Fed

21  Ex package to Dr. Stuelpnagel in late January and Illumina's

22  patent filings changed directions after that.  Changed

23  directions.  Really?  Dr. Walt's '410 Patent was filed

24  16 months earlier.  Patent filings didn't change direction.

25  You saw the Apache patent on the chart as well.  The patent

1   filings didn't change direction.  It says you can use glass,

2   silica, silica-based materials; he's talking about a flat

3   planar substrate, not fiberoptics.

4        So they say well, there's the Todd Dickinson application,

5   but that's not until February of 2000, and it doesn't show

6   anything new about this idea.  The '441 patent, which is in

7   evidence, is what resulted from that Dr. Dickinson provisional

8   application in February 2000.  This is what it describes.

9   That's not BeadChip.  That's why.  It's not even listed on the

10  BeadChip package.

11       The '441 isn't listed there.  The '540 is.  The '410 is,

12  and then these are other patents not related to these issues.

13  So the Todd Dickinson provisional has nothing to do with

14  BeadChip, and the package to Stuelpnagel didn't send

15  Illumina's patent applications in a new direction.  The '410

16  had already been filed, 16 months earlier.

17       So you can read every page of that '682 Patent.  I don't

18  know that you'll have time or feel the need to do it.  It's

19  100 columns.  It's 60 pages long.  There's not a single

20  diagram, there's not a single photograph, there's not a word,

21  there's not a sentence, there's nothing in that patent

22  application that Dr. Zebala says he sent to Dr. Stuelpnagel

23  that would have unstuck anybody.

24       There's nothing in there like BeadChip.  There's no

25  description of BeadChip.  There's no recipe for BeadChip.

1    There's no discussion of individual beads in individual wells.

2        It took Dr. Metzker, in this 60-page patent, searching for

3    a little sentence here or a little sentence there, where if

4    you combined them in theory you could force the idea of a

5    single layer of beads.  There's nothing in there that provided

6    a technological unsticking for Illumina.

7        What the patent describes, what the multi-media CD

8    describes is something completely different, and that is

9    Dr. Zebala's idea of enhancing signal strength, 100-fold,

10   400-fold, by aggregating these particles together in a

11   three-dimensional network.  That's what you heard a younger

12   Dr. Zebala touting on that CD in that PowerPoint.  He didn't

13   say anything about individual beads in individual wells.

14       He talks about using inexpensive scanners.  In fact, in

15   the audio portion, in Exhibit 311, I think it's in type, he

16   says, "You could image this with a 35-millimeter camera on a

17   microscope."

18       You can't do that with BeadChip.  You need scanners that

19   cost hundreds of thousands of dollars.  Why is that?  Because

20   the dim image of each individual bead, 3 microns, 2 microns, 1

21   micron, each needs to be read separately.  You heard that the

22   increase in signal strength of a single bead compared to flat

23   glass, is only four-fold.

24       Dr. Zebala's patent criticizes other prior art that gave

25   you a 10-fold increase.  That's not enough.  He was going for

1    100-fold increase, 400-fold increases, and the way you get

2    there is by this three-dimensional network.

3        BeadChip went in the opposite direction, and so if

4    Dr. Stuelpnagel -- and he didn't deny getting the package.  He

5    says, I don't remember it, which isn't a surprise.  He

6    received hundreds of these packages a year.  So if he got

7    it -- and Dr. Zebala says that after receiving it,

8    Dr. Stuelpnagel said no thanks, we're going in a different

9    direction.

10       Illumina did go in a different direction.  It went in

11   randomly assembled beads-in-wells and not this gelled network

12   of particles linked together in three dimensions.  If you look

13   at the patent application, if you look at the marketing CD,

14   there's nothing in there describing individual beads-in-wells.

15   There's nothing in there describing a silicon dioxide surface

16   of a flat slide as being a polymeric binder.

17       The polymeric binder describing the patent is created by

18   the sol-gel method where each of the beads are connected

19   together as you saw in the diagrams.  There's nothing in that

20   package that gets the scientists at Illumina unstuck.

21       So let's talk now about some of the trees in the forest of

22   Claim 1, and all you need to do is be satisfied that one of

23   these elements is missing, and there's no infringement, and

24   there's no invalidity; he can go home with the patent he

25   invented.

1       So Claim 1 requires a gelled network, and then gelled

2   network is defined, and that includes the requirement that the

3   porous coating have particles linked together to form a porous

4   three-dimensional network.

5       How do you form a three-dimensional network of particles?

6   Well, its plain meaning, when you take things that have three

7   dimensions themselves, but then you arrange them in a network,

8   this is what a three-dimensional network looks like

9   (indicating).

10      It doesn't take a scientist to know this.  If you take

11  soup cans and you arrange them two-dimensionally, you are

12  arranging them in one layer.  Each soup can has three

13  dimensions, but you are arranging them in two dimensions.

14      What Syntrix is asking is that you essentially delete

15  three-dimensional from the definition.  If particles are

16  three-dimensional, you don't need to say a three-dimensional

17  network.  You just say a network of particles.  It has to add

18  meaning, and it's this plane meaning that you heard from

19  Dr. Mrksich.  They are arranged in three dimensions.

20      That's consistent with the rest of the patent.  It's

21  consistent with the rest of the patent, and that's important.

22  In the glossary definition that you received, there's a

23  definition of "abstract."  There's a definition of "drawings."

24  And you heard, as I went through this with probably three

25  witnesses, but primarily with Dr. Mrksich, if you look at the

1  abstract, you look at the drawings, you look at all the

2  examples, every one of them describes something that's a

3  three-dimensional network in the plain meaning sense, which is

4  the way you arrange them.  So here's what the glossary says

5  about "abstract" and "drawings."

6      I will read it to you.  It's in the back of your

7  instructions.

8      "Abstract is a brief summary of the technical disclosure

9  in the patent to enable the U.S. Patent and Trademark Office

10  and the public to determine quickly the nature and gist of the

11  technical disclosure in the patent."

12     When you read the abstract, it's all about increasing

13  density of ligand attachment for increasing signal strength.

14     What are drawings?  "The drawings are visual

15  representations of the claimed invention."  Of the claimed

16  invention.

17     The definition of claims.  Yes, ultimately you have to

18  decide this based on the language of the claim.  This is

19  Instruction 13.  The figures and text in the rest of the

20  patent provide a description and/or examples of the invention

21  and provide context for the claims.  Provide context for the

22  claims.

23     So that's the exercise that I went through with

24  Dr. Mrksich.  You start with the plain meaning,

25  three-dimensional when you look at the rest of the patent and

1   does it confirm this?  Absolutely.  Absolutely.  The abstract,

2   the background section, all about the fundamental purpose of

3   this patent, all about the fundamental purpose of increasing

4   signal strength by aggregating these particles.

5       Remember that paragraph that discusses if you get to a

6   smaller particle size, there's a greater -- there's a 400-fold

7   increase in signal strength?  That only works when it's

8   three-dimensional.  It only works when it's three-dimensional

9   when you add additional layers by the particles getting

10  smaller.

11      So besides the plain meaning of "gelled network," besides

12  the abstract, the background section, all of the figures and

13  drawings and photographs, all 24 examples besides all of those

14  confirming that three-dimensional network means in three

15  dimensions.

16      We also see how others in this field were applying that

17  same concept at the time.  When you take objects that are

18  obviously three-dimensional, everything is, a single atom is

19  three-dimensional; when you arrange them in a planar format,

20  in one layer, that's two-dimensional.  We saw this language

21  from the Seul Patent, and also from the Seul Patent a planar

22  array of beads.  And the Walt Patent itself, the Walt '410

23  Patent, which again predates the package to Stuelpnagel by 16

24  months.

25      The preferred embodiment.  As we all know, what he's

1   talking about is beads at the top of the fiberoptic bundle,

2   although the '410 talks about other surfaces as well.  He

3   talks about the X-Y coordinate, and he talks about

4   two-dimensional configurations as well as three-dimensional.

5   The three-dimensionals, he gives the example of the porous

6   block of plastic where it goes up.  But generally, the

7   substrate is planar.  That's the surface of the fiberoptics or

8   most of the other substrates that are disclosed here.

9       So Dr. Mrksich is right that "three-dimensional" means

10  three-dimensional.  It means more than one layer.  That's the

11  only definition that makes any sense, reading this patent.

12      So what did Dr. Zebala say about three-dimensional?  He

13  said, it's really a network of voids.  Really?  That's not

14  what it says.  It says it's a network of particles.  He also

15  describes it as like a sponge.  Well, we don't really disagree

16  with that.  This is a close-up of his porous coating

17  (indicating).  It is like a sponge.

18      But that's nothing like BeadChip.  BeadChip isn't in a

19  sponge.  It's randomly assembled beads in one layer, each

20  separated from another, in an individual well.  So what does

21  Dr. Metzker do?  He scours the patent, skipping over the

22  abstract, the background section, all 24 examples, all of the

23  diagrams, all of the figures, to search for provisions where

24  in theory one could get down to a single layer; if you take

25  the smallest coating described and the largest particle

1   described, you could in theory get down to a single layer.

2       Let's go to the next slide.

3       That's the 400-pound baby examples.  Perhaps it's crude

4   that you heard from Dr. Mrksich that, sure, people range from

5   18 inches to 7 feet.  They range in weight from 12 ounces, I

6   guess, up to 400 pounds.  But there's no such thing as a

7   400-pound baby.  There's no such thing as a 400-pound baby in

8   this patent.  How do we know that?  Because the definition

9   tells us that.  The abstract tells us that.  The background

10  section tells us that.  Every figure, every photograph tells

11  us that.  All 24 examples tell us that.

12      I won't go through the other provisions.  You saw where he

13  hunts and pecks to try to find something, something that will

14  overcome this plain language and that will overcome the

15  abstract and all the rest of the patent.  It just doesn't cut

16  it.

17      Let's go up to the next slide.

18      All right.  So at the end of the day, this element on

19  three-dimensional, Syntrix can't meet its burden of proving

20  that BeadChip arranges its beads in a three-dimensional

21  network.

22      If you agree with that, your work is done on invalidity.

23  And that first question you check "no" for 3 micron beads,

24  "no" for 2 micron beads, and "no" for 1 micron beads.  Your

25  work is done on that whole front section of the verdict form.

1    But let me talk about another element that's also missing.

2  Again, you don't even need to worry about this if you agree

3  with us on three-dimensional, and that's the requirement that

4  the particles be linked together.  But as you saw, the

5  particles in BeadChip are nothing like the particles that are

6  linked together as described in the Zebala patent.

7    Figure 1A that shows the circle around each bead.  This is

8  the porous coating, the circle -- I think it was number 28,

9  29.  I forget which is described -- that's the polymeric

10 binder.  That's the polymeric binder.  That's nothing like the

11 silicon dioxide layer that Dr. Metzker says is the polymeric

12 binder that he finds in BeadChip.

13   That's created by the sol-gel method described in the

14 patent where you mix the beads in solution and it dries and

15 you wind up with a polymeric binder around each particle.

16 That makes them stick together in this aggregation of

17 particles that are linked together.

18   That's what the patent describes what Dr. Metzker needs to

19 do that satisfy this element for BeadChip, is tell you that

20 the slide itself is a polymeric binder.  But he has to admit

21 that the patent says silicon dioxide can be the substrate,

22 because it says that.  And he has to admit that the surface of

23 the substrate can be made from something different from the

24 rest of the substrate, including silicon dioxide.

25   So you have a BeadChip, it's made of silicon and silicon

1   dioxide that the patent says is a substrate, or the surface of

2   a substrate.  And Dr. Metzker needs to say, no, no, no, I am

3   now redefining that as being the polymeric binder, which looks

4   nothing like that Figure 1A, which isn't made through the

5   sol-gel method.

6       He says, I am going to redefine it.  And how does he get

7   there with that movie he created which suggested that it's

8   actually added on top.  And we know it's not.  We know it's

9   grown within through this oxidation process.  It's not added

10  on top.

11      So if you read the patent and you agree with Dr. Mrksich's

12  correct reading of it, there's no linking because the only way

13  to link is through a polymeric binder, and there's no

14  polymeric binder in BeadChip.

15      Let me talk about known discrete full thickness volume.  I

16  know it's a confusing concept, but it's another element that

17  is lacking.  This idea perhaps works with Dr. Zebala's porous

18  coating.  You may recall this testimony.  I asked him, how do

19  you know when you have a known discrete full thickness volume

20  with his coating.  And he says, if you take a pipette and you

21  apply the compounds there, where they are applied is the known

22  discrete full thickness volume.  That doesn't work with

23  BeadChip, with randomly assembled beads.

24      So Dr. Metzker needs to come up with this theory where

25  sort of after the fact you sort of identify it, but that's not

1  what the patent says.

2       Let's go to the next slide.

3       It's all arbitrary because you saw how Dr. Metzker drew

4  it.  This is how Dr. Zebala drew it (indicating).  They are

5  different.  They can't even -- even the author of the patent

6  and the expert in court don't know really how to find a known

7  discrete full thickness volume.  When the multiple beads are

8  next to each other, it's anybody's guess.  On the left is how

9  Dr. Metzker defined it, drew it.  (Indicating).  But as

10 Dr. Mrksich showed you, there's an infinite number of ways

11 that you can try to draw it where two beads are next to each

12 other.

13      So let me talk about some other claim terms that may apply

14 just to certain BeadChips, and I think that's why in your

15 verdict form there's some questions you are asked, 3 micron, 2

16 micron, 1 micron.  If you agree with us that there's no

17 three-dimensional network, then it's no, no, no, for all

18 three.

19      If you agree with us that there's no linking, even if you

20 think there's a three-dimensional network, it's no, no, no,

21 for all three.

22      If you agree with us that even if you think there's a

23 three-dimensional network with particles linked together but

24 there's no known discrete full thickness volume, it's no, no,

25 no, for all three.

1     But here's where you need to do some further analysis if

2  you get that far, and I hope you don't.  One element is

3  substantial uniform thickness, and the definition is very

4  clear; the coating can't vary by more than 30 percent over the

5  entire coated area.

6     So here's another disagreement between Dr. Metzker and

7  Dr. Mrksich.  Dr. Mrksich does an analysis using actual

8  manufacturing data, using his formula which later on

9  Dr. Metzker tried to adopt, and what that shows is that when

10  you measure substantial uniform thickness over the entire area

11  for the 1 micron and the 2 micron products, the variation is

12  greater than 30 percent.

13     These are current slides.  And then on this page and the

14  next are previous slides (indicating), but it's only the 3

15  micron products that satisfy that requirement.

16     So on the verdict form -- on the verdict form, on this

17  element and this element alone, we agree that the 3 micron

18  beads have substantial uniform thickness as defined, but not

19  the 1- and 2 micron beads.

20     You will recall there's a difference in methodology.

21  Dr. Metzker criticizes Dr. Mrksich because he says that

22  Dr. Mrksich is including the high points, Mount Rainier -- I

23  think I said Mount Washington -- but, of course, the

24  definition says across the entire coated area.  If there were

25  a Mount Rainier, you'd have to count it.

1    And even Dr. Mrksich didn't do that, he used one standard

2  deviation, so he wasn't looking for the highest point, he was

3  looking for one standard deviation, which you heard on a

4  BeadChip with 100 million beads would be 400,000 beads.

5    And of course, in BeadChip you can't have any Mount

6  Rainiers because once a bead is much more than 50 percent out,

7  it's going to fall out.  So you are talking about a relatively

8  narrow range.

9    Let me talk about void regions.  Void region requires --

10  well, Claim 1 requires that the article have void regions

11  ranging from 1 to 1500 nanometers in diameter.  And here

12  again, the experts take very different approaches.  What

13  Dr. Metzker does is try and look for every little nook and

14  cranny underneath the bead, between the bead and the well

15  bottom, or the side of the well -- and of course, you'll

16  always find with any kind of BeadChip or porous coating or

17  whatever you are looking at that has particles, you are always

18  going to find something as small as 1 nanometer, because if

19  you get -- take a particle or bead and you measure it from the

20  closest point between what is touching, it's always going to

21  be 1 nanometer.

22    But that only works if you agree that the silicon dioxide

23  layer is in fact a polymeric binder that's part of the porous

24  coating.  And it's not.  So all you are left with is what's

25  above that line in the BeadChips, then the only relevant void

1   regions are the spaces between the beads, and that's what

2   Dr. Mrksich looked at.  So that's the result.  Only the 1

3   micron beads, only the 1 micron beads have spaces that are

4   close enough that fall under 1500 nanometers.

5       So here it's the opposite of what we looked at for

6   substantial uniform thickness.  Here we agree that for this

7   element, and obviously not the others, the 1 micron beads have

8   void regions less than 1500, but not the 2 and the 3 micron

9   beads.

10      The last claim element I am going to talk about is

11  continuous.  The patent requires that the surface of the

12  substrate, the substrate, have virtually no discontinuities or

13  gaps.  Dr. Mrksich's analysis of this is pretty

14  straightforward.  The substrate is the slide, and in BeadChips

15  (indicating) because of the way the beads-in-wells are

16  arranged, there are large discontinuities and gaps.  And

17  therefore, for this product, for this claim element, all of

18  the BeadChips don't contain it.

19      But Dr. Metzker does a different analysis.  He looks --

20  let's go back to the prior slide.  He looks at just the

21  stripes, ignores the rest of the substrate, and he says that

22  what you are really looking for is empty wells and if there's

23  a certain percentage of empty wells within the stripe, then it

24  does or doesn't satisfy the requirement of virtually no

25  discontinuities or gaps.

1    That's pretty remarkable.  So here Syntrix is claiming

2    that BeadChips stole an idea that he had in his '682 Patent,

3    but here (indicating) this doesn't infringe if, under the

4    latest opinion from Dr. Metzker, there's only an 80 percent

5    fill rate, that this (indicating) does infringe because it's

6    91 percent or 98 percent, and this does infringe, but this one

7    doesn't infringe (indicating).

8    Really?  Is that what we are coming down to in deciding

9    whether or not BeadChip is really described in the '682

10   Patent?  But let's talk about Dr. Metzker's analysis.  You

11   heard him in deposition.  I couldn't have been any more clear

12   in my question, and this is at a time when he's thinking

13   98 percent is enough because I think the beads in BeadChips

14   are at a 98 percent level.

15   He had heard some deposition testimony, but somebody who

16   was sort of guessing that that's probably the rate.  So I

17   asked him:

18   "Question:  What percentage -- what percentage of gaps or

19   discontinuities is allowed without failing the virtually no

20   discontinuity or gap requirement?"

21   "Answer:  I would say less -- equal to or less than

22   2 percent."  Well, in other words, 98 percent fill rate,

23   2 percent empty rate.

24   He wasn't giving me an example.  I wasn't asking him for

25   an example.  I didn't put here, but you heard the follow-up

questions:  "What's your basis for that?  Can you cite me any
scientific literature?"  "No, no, it's just my best judgment."
That's what he said.

    So what happened after that?  When we learn of this
98 percent theory, we get the actual PBeads data, and lo and
behold -- lo and behold, for a large percentage, a large
percentage of BeadChip products made over the years, they were
less than 98 percent fill rate.

    In fact, all of the BeadChips made in 2005 had less than
98 percent.

    In 2006, 73.6 percent had less than 98 percent.

    In 2007, et cetera, we are getting a little better but
still a quarter failed that requirement (indicating).

    So what then happens?  A new opinion, a new opinion.  Now
it's 90 percent.  Really?  90 percent?  One in ten is
virtually none?  Virtually no?  If you've got a 10 percent pay
raise, would that be virtually not a pay raise at all?  I
don't think so, not in real life and not in science.

    It's their burden to prove damages.  They have had all of
our manufacturing data.  They have had this information, and
they have failed to give you any damage figure applying a
98 percent fill rate for the beads.  That was their burden.

    So if you get this far, if you think they have met every
other element, except for certain beads, the 98 percent level,
the damages still have to be zero because they haven't proven

1  that.

2      Before I get to invalidity, let me talk about this

3  remarkable letter that Syntrix sent to Children's Hospital,

4  sent in January of 2010 because they were preparing to sue

5  Illumina for patent infringement on the '682 Patent and only

6  the '682 Patent.

7      You heard them trying to explain this away.  Well, it was

8  generally talking about all of our patents.  No, it wasn't.

9  It pretended to be.  There was a very specific purpose, and

10  that was to get Children's to release any interest that it had

11  in this patent.

12      You've heard from Judge Settle, we are not contesting

13  title.  This is not a claim by Children's against Dr. Zebala

14  for misrepresentation or fraud.  But it is relevant.  It is

15  relevant, you heard from Judge Settle, for infringement, for

16  credibility, for date of invention.  And it's very telling,

17  because what does he say to Children's?  There has not been

18  any commercialization, any sales of any of the research

19  Dr. Zebala conducted at Children's and UW.  Yet, their whole

20  case here is asking you to say that yes, Illumina has

21  commercialized, has commercialized that research.

22      He wasn't talking about that he personally hadn't

23  commercialized.  He was telling Children's, trying to convince

24  Children's, don't worry, my patent, my research has no value,

25  so you can just sign this release.  Well, you should hold him

1    to what he told Children's.  There's been no

2    commercialization, and the reason is BeadChips don't use the

3    '682 Patent, don't infringe the '682 Patent.

4        Let me now move to invalidity.  As I said, we didn't come

5    to court asking you to invalidate the patent.  It's what

6    Dr. Zebala is forcing us to do.

7        Yes, could they predict what our case would be about, we

8    don't infringe?  I think you can expect most defendants to say

9    that.  And if we do infringe, the patent is invalid, of course

10   it is, of course it is, because BeadChip is using the '540

11   Patent and the '410.  It wasn't much of a prediction.  That's

12   what these cases are all about.

13       But if Dr. Zebala's patent doesn't cover the random

14   assembly of beads, you can find it invalid.  But if BeadChip

15   is covered by the '682 Patent, the product that is the result

16   of the '540 and the '410 Walt Patents, then you have to find

17   the '682 Patent invalid.

18       Let me start with the '410 Walt Patent.  It's filed on

19   September 11, 1998, months before Dr. Zebala filed his

20   provisional application in December of 1998.  And that's why

21   they fight so hard for this early invention date, this early

22   reduction to practice date.

23       We got an advance copy, at least a black and white copy of

24   their slide.

25       Is this working now or not?  I will hold it up.  I don't

1   know if you can see it.  But they show the Walt '540 Patent

2   here, and an invention date that he claims of August 5, 1997,

3   and then he says actual reduction to practice on August 28th,

4   shows the Walt '410 filed here, and of course his patent isn't

5   filed until later.

6       Then he draws a line saying diligence.  So he can get an

7   earlier date, he can get an earlier date of invention and beat

8   the Walt '410 Patent, only if he proves diligence, only if he

9   proves diligence, and he's got to do more than just saying I

10  was diligent.  He has to corroborate.  He has to corroborate.

11      There's this large period here between when he left the

12  lab in the end of July 1998, and when he filed his patent

13  application; a four-month period where you heard -- I asked

14  him and I asked Dr. Metzker, is there any corroboration

15  whatsoever what you did on any day, any diary entry, any

16  calendar entry?  None, absolutely nothing.

17      You saw how every other scientist that's been on the stand

18  and has had their lab notebooks examined, they dated every

19  page, they numbered every page, somebody signed every page.

20      What's remarkable about Dr. Zebala's lab notebook is none

21  of that happened.  Not a signature, not a page number.

22  There's some litigation page numbers that the lawyers added at

23  the bottom with a bunch of letters and numbers, but he didn't

24  number them, he didn't sign them.

25      Even after he left the lab, he wouldn't have a lab

notebook for this period between July and December.  He has no

paperwork showing what he did, and that's his obligation.  So

he can't beat the '410 Patent that was filed before he filed

his application.

     But let's go back to the Children's letter and see what he

said about this very issue.  He said, "We are unable to

determine what information came from the use of facilities at

UW or at Children's, or was obtained by Dr. Zebala's research

conducted after completing his residency."

     He's now asking for a reduction to practice of 1997, when

he's still in the lab, and yet he's telling Children's here,

you know, I am not sure when I did my inventing, it might have

been after I left the lab in 1998.  You need to hold him to

what he told Children's to get the release.

     That takes us to December 1998, the only date he's allowed

to have without corroboration and due diligence.  You also

heard, when I asked him in deposition, when he was serving as

the designated corporate representative -- what we call

30(b)(6) -- on this topic, the topic was date of reduction to

practice, and I asked him the question and he said December 1,

1998, the date of his filing.

     He didn't say August of 1997.  You should hold him to what

he said in his deposition, and you should hold him to what he

told Children's.  When you do that, the Walt '410 is prior art

because it was filed before he filed his application in 1998.

1       So let's go through the invalidity analysis of Claim 1.

2       Can we go to the next slide?

3       So we were criticized because we didn't take Dr. Mrksich,

4   on about the last day of trial when you had heard all this

5   stuff for three weeks, for not showing you and blowing up each

6   and every column and line on all of these elements.  We didn't

7   need to do that.  The only ones they contest, you recall, are

8   substrate, continuous and substantially uniform thickness.

9   Those are the only boxes that they put up, and so that's what

10  we focused on and we did talk about it.

11      I talked about it with Dr. Mrksich on direct and

12  Dr. Metzker on cross.  And they said -- at least Dr. Mrksich

13  did -- substrate exists in both the '540 Patent and '410.  The

14  '410 is clear it could be any surface, it could be a flat

15  silicon surface.  The '540 describes the optical fiber

16  bundles.

17      But remember, we are using their analysis; under their

18  analysis, the fiberoptics bundles can be a substrate.  And you

19  saw where in the '680 patent it says that the substrate can be

20  virtually anything, including a strand, including a strand.

21  So substrate exists in both the '540 and the '410.  Same thing

22  with continuous.

23      This was remarkable.  Dr. Metzker says, we know that

24  continuous doesn't exist in the Walt patents because just look

25  at the picture, and the pictures there, not every bead -- not

1   every well has a bead in it.  But how does he apply that

2   analysis on infringement where he wants you all to ignore

3   every photograph and every diagram.  Well, he can't have it

4   both ways for purposes of invalidity.

5       We showed you where in the text of both the '540 and the

6   '410 Patent it talks about putting a bead at the end of each

7   fiber.  So what's good for Dr. Metzker for infringement is

8   what you need to apply for invalidity.  And the same thing for

9   substantially uniform thickness.  You heard Dr. Metzker say

10  that in the etching process, you can control the depth of the

11  well, you can control the size of the bead, so of course

12  substantially uniform thickness is described in both patents.

13      So we did our job, and I hope we did it as quickly as we

14  could on one of the last days of trial.

15      So, let me talk about the written description issue.  So I

16  have talked about now anticipation; that is, for invalidity

17  purposes, if the '682 Patent is as broad as they say it is, it

18  was anticipated by both the '540 Patent and the '410.  The

19  other issue you have is written description, and this is just

20  the flip side of what we were talking about with

21  three-dimensional network.

22      The claim language, if it's interpreted to mean a single

23  layer of beads, fails the written description requirement

24  because when you read the rest of the patent, you read the

25  abstract, you read the background section, you read everything

1   about it, there's no description anywhere of a porous coating

2   made up of just a single layer of particles.

3       All of the examples, all of the images, all of the

4   discussion, discusses porous coatings with multiple layers, so

5   it would fail the written description requirement.

6       We had another written description point as well, and that

7   has to do with particle size.  Claim 1 doesn't discuss -- at

8   least specifically; they say it's implicit -- a size of a

9   particle.  But somebody reading the patent would know, would

10  know that there's a limitation to particle size.  And you need

11  to go no longer to this language that you've seen many times

12  at column 27, and this is the paragraph, one of the many

13  paragraphs talking about the purpose of the patent and

14  increasing signal strength and surface density.

15      And Dr. Zebala says in contrast, "A primary particle size

16  greater than 1000 angstroms yields porous coatings with

17  surface areas too small to be useful in the present

18  invention."

19      In other words, you are not going to get the signal boost

20  with this three-dimensional coating if you go any larger than

21  1000 angstroms.  And yes, there's a reference somewhere to

22  2000 angstroms.  But that's it.

23      Let me go back to this slide that you saw in opening, just

24  to give you some relative idea of what we are talking about.

25  These little brown -- those little brown circles (indicating).

1  Those are the particles discussed by Dr. Zebala in his patent.

2  The larger of the three tiny brown particles is 1000

3  angstroms, the largest useful size described by Dr. Zebala in

4  his patent.

5      The two sizes below that, 500 angstroms, that's what he

6  used to create his porous coating, that's what he worked with

7  in the lab.  Again, you heard, you may recall, this is 2

8  microns thick so this is 40 particles high, at least, if they

9  were stacked end on end.  And then there's 200 angstrom

10  particles because he also worked with that in the lab.

11      This blue circle (indicating), that's a 1 micron bead.

12  That's the smallest bead used in BeadChip, 10 times larger

13  than that most useful size of the largest useful size

14  described in the patent; 20 times larger if you go to the 2

15  micron bead, and we don't even have 3 micron bead on there.

16  So that's why -- another reason for invalidity if the patent

17  is stretched as broad as they want you to stretch it.  We are

18  not asking you to stretch it.  They are asking you to stretch

19  it.

20      So I have talked about infringement, and I have talked

21  about invalidity.  I have to talk about a subject I don't want

22  to talk about, and that's damages, because if you reject all

23  of our arguments, and I hope you don't, you have to make this

24  analysis.  So let me talk about the obvious first, which is

25  any percentage times zero is zero, and that's what I hope you

1  decide.

2      Mr. Albright predicted exactly what I am going to say

3  because it's the truth.  They are asking you to award a

4  royalty rate that is tried -- that is ███████ what Tufts

5  receives -- received in the beginning and receives to this

6  very day -- on every BeadChip that is sold, ██████ the royalty

7  that Illumina paid for this ground-breaking revolutionary

8  technology.

9      ███████ the royalty rate that Illumina has been paying for

10  the technology that founded the company, for the technology

11  that allowed it to go public, the technology that created --

12  made the HapMap Project a success.

13     So Syntrix wants ████████ that royalty rate for a porous

14  coating idea, this gelled network of particles, that nobody

15  uses, wants █ percent for that.

16     You recall Dr. Zebala tried -- tried to sell his idea.  He

17  went to 13 companies, including Illumina.  Dr. Stuelpnagel

18  apparently said no thanks, we are going in a different

19  direction, as they did.  Nobody was interested in it.  Why?

20  Because it was going in the wrong direction.  It wasn't

21  focused on being able to test individual small samples like

22  BeadChip does.  It was trying to increase signal strength.

23     The only person -- the only company interested, you heard,

24  was Applied Biosystems, ABI, where Dr. Zebala had an inside

25  track because his friend and mentor, Dr. Barany from Cornell,

1    had a connection, but even they backed out because they were

2    worried about Affymetrix's patents.

3        So you can't get █ percent, twice what's paid to Tufts for

4    groundbreaking technology, for an idea that nobody was

5    interested in. To this day, to this day, nobody's been

6    interested.  To this day, not a single porous coating has been

7    sold.  To this day, this is all that exists of that gelled

8    network of particles idea.

9        So let's look at the analysis of Mr. Cook.  He starts with

10   the Tufts license.  He makes appropriate upward and downward

11   adjustments.  I won't go into all of the reasons here.

12   Hopefully you'll recall some of the reasons, but he winds up

13   with ████ percent on arrays only.

14       And he does something similar to Dr. Ratliff.  He then

15   says okay, because the royalty base will be on total sales,

16   not just BeadChips, but also the whole kits, you lower the

17   rate, as did Dr. Ratliff, to account for that, and you wind up

18   with █ percent.  The result of that is these numbers

19   (indicating).  Remember, he's using actual sales as opposed to

20   orders.

21       At █ percent on all slides, if you think they all

22   infringe -- and I hope you don't -- it's ████████.  If you

23   think that some slides failed the substantial uniform

24   thickness, so you exclude those, it's ████████.  I am

25   rounding up.

1    If you think the slides satisfy the substantial uniform

2  thickness requirement but not void region, so it's only the 1

3  micron slides, then it's ████████████.

4    I am done with damages.  But the number is zero.  The

5  number is zero because BeadChip is a very different product

6  than what Dr. Zebala described in his '682 Patent.  It's a

7  product built on Dr. Walt's revolutionary idea of random

8  assembly of beads-in-wells.  It's a product perfected into a

9  commercial product by years of hard work at Illumina, tens of

10  millions of dollars of investment.  It's nothing like the '682

11  Patent and it doesn't infringe.

12    The information you heard over the last three weeks, I

13  know was very technical in nature, but it's important.  It's

14  important to both parties, and I hope you have realized, and I

15  hope I brought into focus the big technological gap in their

16  story.  There was nothing that got Illumina unstuck.  All

17  Illumina has been doing from day one is beads-in-wells, the

18  idea that Dr. Walt came up with.

19    So I know it was tough, and I am sure some of you felt

20  like you were back in school again.  But you should all be

21  proud of performing your civic duty.  I know we all appreciate

22  it.

23    In the end, your decision is straightforward.  BeadChips

24  do not infringe.  They are not a gelled network aggregated in

25  three dimensions.

1    Thank you for your time.

2        THE COURT:  We are going to take a brief recess,

3  10 minutes, give everybody a chance to refresh and then we'll

4  close out the trial.

5        THE CLERK:  All rise.

6    (Jury not present.)

7        THE COURT:  Mr. Gilliland, what is your estimate?

8        MR. GILLILAND:  Probably about 30 minutes or less.  I

9  will try to keep it under that as best I can.

10        THE COURT:  That will be fine.  That will take them

11  to the noon hour and then they will have their lunch break.

12        MR. ALBRIGHT:  Thank you, Your Honor.

13    (Morning recess.)

14    (Jury present.)

15        THE COURT:  Please be seated.

16        THE CLERK:  All rise, Court is back in session.

17        THE COURT:  Mr. Gilliland, are you going to use the

18  Elmo?

19        MR. GILLILAND:  I may, Your Honor.  If it acts up, I

20  have got a backup plan.

21        THE COURT:  It has to transition over from the

22  computer base to that, but it should have warmed up quicker.

23  I am not sure why it didn't.

24        THE CLERK:  I think it's because of the remote.  Do

25  you have the wireless remote?  I think that's what does it;

1  they are using the wireless remote.

2          THE COURT:  Okay.

3          MR. GILLILAND:  If it acts up, I will improvise, but

4  I think we can cover it.

5          THE CLERK:  Please rise for jury.

6     (Jury present.)

7          THE COURT:  Everyone, please be seated.

8     You may proceed, Mr. Gilliland.

9          MR. GILLILAND:  Ladies and gentlemen, thank you very

10  much for your time and attention these past couple weeks.  I

11  am sure you feel like it's been drinking from a fire hose at

12  times because of the amount of information that's been thrown

13  at you by the lawyers and witnesses involved.  And I can see

14  each of you have been paying attention and taking notes, and

15  we all appreciate that very much.

16     Now, I want to respond to one thing that Mr. Rosenbaum

17  said right out of the box is that he had this feeling in the

18  pit of his stomach, and I really do regret that he feels that

19  way about it.  But this case is not about the way

20  Mr. Rosenbaum feels; it's about the facts.

21     And so let's go over just a few of those facts, and I am

22  going to try to do this fairly quickly.  I am not going to

23  respond to everything, because you've heard the evidence,

24  you've taken the notes.  You don't need me to rehash all of

25  that for you.

1    Now, the first thing when we started the case, I told you,

2  you were going to hear from the defendants that they were

3  going to deny, deny, deny.  And then it turns out they were

4  going to try to blame Dr. Zebala for things, which they have

5  done.

6    But we know from the start that they did get Dr. Zebala's

7  information in 2000.  We have -- we've heard the testimony of

8  Dr. Stuelpnagel; of course he did not come into court.  But --

9  if we could go to the next slide, please.  We've shown you,

10  and you'll have this back there in the jury room with you,

11  Exhibit 7; it's the NDA with Dr. Stuelpnagel's signature right

12  there on the bottom of the second page.

13    Dr. Zebala showed you the Fed Ex mailer that went out the

14  very next day.  This is dated, and you can see the date at the

15  top of the second page, the very top of the page.  It's dated

16  January 20, 2000.  It went by fax, so he got it.  He got the

17  information the very next day.

18    And we've gone through the things that were sent.  They

19  even played some of it into evidence.  You saw the slide show.

20  You heard Dr. Zebala's voice from 13 years ago or so.  And so

21  they know they got it.  Included in that package was this,

22  which you'll see (indicating).  This is going to go back to

23  the jury room with you as well, it's Exhibit 64, A-64, and

24  it's Dr. Zebala's patent application that ultimately became

25  what you also have as Exhibit 288, the '682 Patent.  You will

1    have this back there with you as well.

2        All of that information was received and sent to and

3    received by Illumina around the end of January 2000.  And then

4    10 days later, the same person who signed this NDA,

5    Dr. Stuelpnagel, got an invention disclosure form that he

6    filed with the United States Patent and Trademark Office.  And

7    that's the one that we think shows they had knowledge of

8    Dr. Zebala's patent and his patent application at that time.

9    And knowledge is important for the 125 claims, and we'll get

10   to that.

11       Now, one interesting thing that Mr. Rosenbaum said was,

12   that if you think that the idea was disclosing slides, well

13   Louis Pasteur was using slides, too.  How do you think that

14   Dr. Zebala got a patent if all that is described in here is

15   the use of a slide?  There's a lot more than that.  They know

16   it, and you know it.

17       And what Dr. Zebala disclosed to them was how to put a

18   porous coating on a slide to use it as a genetic array.  And

19   that's what all the testimony has been about.

20       And the first question you are going to be faced with when

21   you get back there and have to fill out this verdict form is

22   going to be basically their first denial.  They deny they

23   infringe.  Well, when you look at the verdict form, Section

24   No. I is the infringement claims.  And that's the first thing

25   you are going to have to address.

1    Now, the important thing to keep in mind -- and we've

2  talked about it a little bit -- are the different standards of

3  proof that apply to the different parts of the case.

4    And you've heard standards of proof, I am sure watching

5  TV.  If you are like I am, I like *Law & Order*; so I see the

6  standard of proof there is beyond a reasonable doubt, that's a

7  criminal case.  Well, here, the standard of proof is

8  preponderance of the evidence.  And the Court has defined that

9  for you in the instructions that you've gotten.  And

10  instruction No. 11 says that a preponderance of the evidence

11  means that must be persuaded by the evidence that the claim is

12  more probably true than not true.

13    And so when you go through the evidence in the case, when

14  you get back there and are considering this, you've got to

15  consider the evidence for both Claims 1 and 125 for the three

16  micron chips.  Were those infringed as -- has Syntrix proven

17  by a preponderance of the evidence that those claims were

18  infringed?

19    Well, let's talk a little bit about the evidence that you

20  have, that you've seen.  And the main evidence of that, of

21  course, is the experts that you heard.  And we brought you

22  Dr. Metzker, who actually worked on the Human Genome Project,

23  who's from the Human Genome Sequencing Center out of Houston,

24  who has done work on behalf of the states of Texas, Louisiana,

25  and Washington.  And he walked you through the elements.  He

1   went from the Court's instructions to the sections in the

2   patent, to the technical documents he had received from the

3   defendant, and showed you how they infringed.

4        The defendants brought you Dr. Mrksich, whose only work in

5   the past four years as an expert witness has been for

6   Illumina.  They are the only ones he's done anything for.

7        But in addition to that, you are going to have something

8   else when you get back there.  As my co-counsel mentioned, you

9   are going to have your common sense.  And you are also going

10  to have Exhibit 714, Dr. Zebala's prototype (indicating).  And

11  you can see it (indicating), it's cut down so it could go into

12  an SEM microscope so he could take those pictures that we saw.

13       But you can see two of the prototypes that he's held onto

14  since 1998.  And you are also going to have Exhibit 716.  This

15  is an example of the BeadChip (indicating).  And I think when

16  you look at those you are going to see a lot of similarities.

17       And when considering that, along with all the evidence you

18  received, I will submit to you that in answering Question No.

19  1 -- if I can bring up the Elmo, please; see if we can get it

20  to work this time.

21       When you get to answer Claim 1, you should answer "yes"

22  for the 1 BeadChip products.

23       "Yes," for the 2 BeadChip products.

24       "Yes for the 3 BeadChip products.  And the same thing for

25  the 125, all the way down.

1   And you are also going to have to address third-party

2   infringement.  Now, that's talking about when customers take

3   the BeadChip products and they use them with the readers and

4   the assays and everything else that Illumina sells.

5   Following the instructions that Dr. Metzker described for

6   you, that Illumina provides to its customers on how to use the

7   BeadChip, so when you are answering Question No. 2, "Has

8   Syntrix proven by a preponderance of the evidence that

9   Illumina's customers have directly infringed Claim 125 of the

10  '682 Patent," I submit to you that your answer should be

11  "yes."

12  And then you'll have to move to these indirect

13  infringement questions that have to do with inducement.

14  This thing likes to switch modes; apparently that's where

15  this flicker comes from.

16  The first question you have to answer, contributory

17  infringement:  "Has Syntrix proven by a preponderance of the

18  evidence that Illumina has contributed to the infringement by

19  Illumina's customers of Claim 125?"  Well, for contributory

20  infringement, that's where this knowledge comes into play.

21  That's where the fact that they knew about the '682 Patent,

22  they knew about the '682 Patent application, comes into play.

23  Because when you read those instructions, when you go to --

24  let me see here if I have it tabbed right -- I believe it's

25  Instructions 18 and 19.  No. 19 talks about contributory

1    infringement.  And one of the elements for contributory

2    infringement is that Illumina is aware of the '682 Patent and

3    knows that the products or methods for which the component or

4    apparatus has no other substantial use may be covered by Claim

5    125.

6         You heard at the close of evidence that Illumina

7    acknowledges it knew at least in January 2007, when Dr. Zebala

8    reached out to them; but you also know because of the

9    nondisclosure agreement and Dr. Zebala's testimony that they

10   knew about this patent as early as 2000.

11        So knowledge is important for contributory infringement,

12   and that's how you know they knew about it and you know they

13   infringed.

14        So I submit to you when you are answering Question No. 3,

15   Claim 125, right here on the top -- I am not sure what page I

16   am in the verdict form -- but on the top of the next page

17   there, your answer, I submit, should be "Yes" for all three

18   BeadChips as to whether or not they contributed to

19   infringement.

20        Then you get to the second indirect infringement, that's

21   inducement of infringement.  That's the instruction No. 18 in

22   the package you have.  That describes for you what's necessary

23   for inducement of infringement.

24        And again, this knowledge is important.  Now, again, they

25   have acknowledged back to 2007 -- and we've proven they knew

1  back to 2000.  And it says that Illumina was aware of the '682

2  Patent and knew that the acts it had taken by Illumina's

3  customers would constitute infringement of Claim 125, or

4  Illumina believed there was a high probability that the action

5  taken would constitute infringement of Claim 125 and

6  deliberately avoided confirming that validity.

7      You've seen evidence they've known about it.  Dr. Metzker

8  has testified to you about it.  The only way to practice Claim

9  125 is to take the BeadChip and use it and perform the steps

10  of Claim 125 applying the reagents and checking everything.

11  So I submit to you when you are answering Question No. 4 on

12  the verdict form, you should answer "yes" for all three

13  BeadChip products.

14      Then it says proceed to section II.  Well, the first part

15  of Section II has to do with the invention date.  And you also

16  have a definition in here for the invention date.  And that,

17  of course as you've already heard, is the date the patent was

18  filed, which is called constructive reduction to practice; or

19  it can be back to the date of conception if you've got

20  corroboration and diligence all the way to the date the patent

21  was filed.

22      And so when you are answering the first question:  "Has

23  Syntrix proven by a preponderance of the evidence that the

24  invention date for any claim of the '682 Patent is prior to

25  December 1, 1998, the date the patent application was filed,"

1   we submit to you that you should answer "Yes," Syntrix has.

2        And you heard Dr. Zebala talk about the dates and refer to

3   that date in August 5th, 1997, in his notebook.  But you also

4   heard Dr. Metzker say:  Well, I saw the notebook.  Dr. Zebala

5   wasn't quite as sophisticated, I suppose, as some of the

6   people at Illumina; so he didn't date and have every page

7   witnessed because he never imagined that he'd need this

8   notebook so many years later in a courtroom in Tacoma.  But

9   you saw he pointed to that page; and by matching that page to

10  a fax from DaGussa, that explained how to use the beads,

11  Dr. Metzker was able to pinpoint the date of August 5th, 1997,

12  as well.

13       So I submit when you are answering Question No. 6, you

14  should write in "August 5, 1997," for both Claims 1 and 125.

15       Now, the next thing you get to after that is Illumina's

16  next denial.

17       First, they deny they infringed.  But if you don't buy

18  that, they deny that it's valid.  Well, let's talk about that

19  for a minute.

20       The first thing to keep in mind is when you are addressing

21  these validity questions, you notice right here on the first

22  line, "Did Illumina prove by clear and convincing

23  evidence," -- that's that higher standard we were talking

24  about.  It's a higher burden than preponderance of the

25  evidence.  And that, as the Court has instructed you, which

1   you can read in instruction 11, says that clear and convincing

2   means you must be persuaded by the evidence that the claim or

3   defense is highly probable; that it's highly probable that the

4   '682 Patent is invalid.

5       Well, let's talk about that.  The first thing is

6   Dr. Metzker walks you through the '682 Patent.

7       You remember where he walked you through infringement

8   element by element.  That's this one (indicating).

9       But he also walked you through the references that they

10  assert, the Walt '540 and the Walt '410.  And for both of

11  those he found multiple missing elements from each of those.

12      Contrary to what Mr. Rosenbaum said, it wasn't just

13  continuous that was missing from both, remember?  It was also

14  porous coating, because porous coating, under the '682, has

15  the "does not swell" requirement.  And Walt '540 and '410

16  taught the muffins rising in a muffin tin.

17      So it was missing continuous.  It was missing porous

18  coating.  And it was missing substantially uniform thickness,

19  which was unimportant for Walt '540 and '410 because Walt only

20  did experiments with fiberoptics where he was looking through,

21  and the uniformity didn't really matter.

22      But you don't just have to rely on that.  Most

23  importantly, the Walt '540 was considered by the patent office

24  when someone put the patent into re-exam.  And remember now,

25  re-exam is not a situation where the patent office goes out

1  looking for patents to re-examine.  Someone has to ask for it

2  to be done; and someone did.  And the Walt '540 was part of

3  that.

4      And that's why, when you get back to the jury room, if you

5  look at Exhibit 288, and you go back here (indicating), almost

6  to the last page, the third from the last page, you will see

7  the Walt '540 is specifically listed on the face of the 288

8  patent.  It was considered by the re-exam.

9      And that's important, because as the Court has instructed

10 you, and you'll see here, I believe it's No. 25, the Court

11 says "When a party attacking the validity of a patent relies

12 on prior art which was specifically considered by the examiner

13 during the prosecution of the application leading to the

14 issuance of the patent" -- which is what happened with Walt

15 '540 in the re-exam -- "or during re-examination of the

16 patent, that party" -- here being Illumina -- "bears the

17 burden of overcoming the deference due a qualified government

18 agency official" -- a patent examiner -- "presumed to have

19 performed his or her job."  So you've got that in there, too.

20     And so when you consider all of that -- wait, I almost

21 forgot, you are also going to have the SAM, which is beads on

22 fiberoptic bundles.

23     And when you look at the SAM, and you look at Dr. Zebala's

24 prototype -- the blue part actually goes down.  Everybody

25 keeps setting it upside down.  When you look at Dr. Zebala's

1  prototype -- and you can open it up and take a closer look --

2  you can see that they appear very different.

3      So that, combined with what you know from the presumption

4  of validity, the fact that Walt '540 went through the patent

5  office, and Dr. Walt himself said that the '410 is just a

6  continuation of it, he didn't do any more experiments in

7  between, you know that when you get to the questions of

8  anticipation, Question No. 7, for both the Walt '540 and the

9  '410, I submit that you should answer "No."

10     The evidence supports validity and does not come anywhere

11 close to overcoming the presumption or meeting the clear and

12 convincing standard.

13     Now, there's also this written description requirement

14 where they say the patent doesn't describe beads of 1 or 2 or

15 3 micron size, or doesn't describe the gelled network; and I

16 don't want to rehash all of that because you've heard a lot

17 already on it from the experts, but there is one aspect I want

18 to bring up.  They keep talking about how there's no

19 description of a monolayer, and that a single layer can't be a

20 gelled network.

21     But what they give you is this board (indicating).  That

22 one, they only want to talk about this part (indicating), just

23 three-dimensional.  Forget the fact that it says porous, or

24 that it's an aggregation of particles linked together in a

25 porous three-dimensional network.  And they don't want to show

1  you the rest of the definition where a polymeric binder is

2  specifically described as silicon dioxide which is, as

3  Dr. Metzker told you, is what's on the BeadChip.

4       So that the patent does disclose, and does cover

5  monolayer.  And you also know because they keep pointing to

6  the Seul Patent, and the fact that the Seul Patent was a

7  monolayer; and it may use the words three-dimensional and it

8  may have that Seul uses two-dimensional, or something like

9  that.  Well, I think this may have been where Mr. Rosenbaum

10 was going with this chicken analogy yesterday.  I didn't quite

11 follow it.  But just because Seul calls it two-dimensional

12 doesn't mean it's different than a gelled network.

13      And in fact, you can tell that the patent office

14 considered one row of beads to be a gelled network, because

15 the patent office considered that Seul Patent application

16 during the re-exam.

17      When you look, again, at the third from the last page, the

18 re-examination certificate, Seul is actually this one towards

19 the bottom (indicating) that's listed as 97/40385.

20      So even the patent office saw that monolayer is the same

21 thing because they said hey, this is similar, let's check it

22 out and see if the '682 Patent should be issued despite that.

23      So because of that, when you get to this written

24 description requirement, "Has Illumina proven by clear and

25 convincing evidence that the specification of the '682 Patent

1  does not contain an adequate written description of any of the

2  claims," I submit your answer should be "No" for both Claim 1

3  and 125.

4      And then finally we get to the damages question.  And we

5  told you they would deny infringement.  But if you don't buy

6  that, they deny that it's valid.  But if you don't buy that,

7  we don't owe them that much.  And then they even give you a

8  few different options to pick from.  Well, let's talk about

9  that real quick.  The first thing to keep in mind, the most

10  important thing to keep in mind is what you have to consider

11  for damages.

12      In this case it's a reasonable royalty.  And one word --

13  or not word, but a couple of words that Mr. Cook, Illumina's

14  expert, didn't really emphasize -- I am probably pushing my

15  luck by trying to zoom this thing -- which you see in

16  instruction 30 is that a reasonable royalty -- Syntrix is

17  entitled to at least a reasonable royalty to compensate it for

18  any acts of infringement.

19      And if you go back to the instruction right before that,

20  instruction No. 29, the Court reenforces for you that Syntrix

21  is entitled to recover no less than a reasonable royalty; no

22  less than.

23      Now, their expert claims that that number should be

24  ▮ percent.  That's where he thinks you should start with your

25  "no less than" analysis.

1       We submit to you that that wholly underestimates the

2    damages of the royalty that's due to Syntrix in this case.

3    And they are trying to fool you by pointing you to the Tufts

4    license and say you should just look at number -- just look at

5    the ▉ percent in the Tufts license.

6       Well, you know that license was struck in 1998.  And when

7    you get to evaluating the reasonable royalty, you've got to

8    look at 2005.  Things don't stay constant in those seven

9    years, and the reasonable royalty rate should not stay

10   constant in those seven years.

11      In addition to that, in 1998 we've heard Tufts got a lot

12   of stuff.  I've forgotten the numbers exactly, because I get

13   it confused what Tufts got and what Dr. Walt got.  Because

14   Tufts got what they apparently cashed out around 2000, around

15   7 or $8 million; and Dr. Walt has already cashed out around 40

16   or more million dollars, and still has more stock left.

17      So it's not just ▉ percent that Tufts got back in 1998.

18   It was ▉ percent plus some kickers.

19      And again, that was seven years before the agreement of

20   the hypothetical negotiation that would have taken place in

21   2005 between Illumina and Syntrix.

22      Now, talking about money on an idea or an invention might

23   seem sort of trivial.  But I submit to you that's one of the

24   things our country was built on.  The right to inventors to

25   hold patents is one of the few things engrained in the actual

1  body of the Constitution.  It wasn't one of the Bill of

2  Rights.  Even our right to a jury trial had to be added later

3  as one of the Bill of Rights.  But the founding fathers saw

4  inventions and ideas as important.  And we all know they are,

5  because we all know about Edison and the Wright brothers and

6  Alexander Graham Bell and other people who came up with great

7  inventions that helped build big things as time went by.

8      Well, I submit to you that for this genetic microarray

9  world, the '682 Patent was just such an invention.

10     Now, Mr. Cook, he comes in and says well, Dr. Zebala

11 talked to 13 companies and nobody took it.  I think the reason

12 we are here today is because somebody did.  I think we've

13 proven to you that somebody was using his invention.

14     And there's two problems with his logic:  one, how often

15 have you tried to sell something and it sold to the first

16 person you talk to?  And then what are you thinking if that

17 happens, right?  I didn't ask for enough, I guess, because it

18 was too good of a deal.  That rarely ever happens.

19     And two, more importantly, who's going to pay you for

20 something if somebody else is already using it without paying

21 you?  If somebody else is already infringing and not paying

22 you a nickel, how are you going to sell it now, right?

23     And more importantly, here's what I think is most telling,

24 folks, is you've been here the past 2 1/2 weeks.  I have been

25 here the past 2 1/2 weeks.  Dr. Zebala, the CEO of Syntrix,

1   has been here every day as well.  And even some of his

2   employees have been coming, because they are interested in

3   what's going on and they care about what happens here today.

4        Illumina didn't even bring Dr. Stuelpnagel down here in

5   person.  They played a video of him.  And their CEO never set

6   foot in this courtroom.  And the person they sent down here,

7   Mr. Kain, who I consider to be a nice gentleman, but for the

8   purposes of this case his testimony was so important he was

9   only on the stand for ten minutes.  That's how much attention

10  Illumina is paying to this case, and that's how much attention

11  you should pay to the royalty rate that they are trying to

12  sell you.

13       And because of that, I think you should pay more attention

14  to Mr. Ratliff's number.  And when you get down to that

15  reasonable royalty rate, and you consider what Mr. Ratliff has

16  told you, and you consider how their sales took off when they

17  finally got this product to market, the one that infringes, I

18  submit to you that that █ percent was a deal.  That would have

19  been a very good deal for Illumina in 2005.

20       So when you are filling in this number, keeping in mind

21  the instruction that it's "no less than," I submit to you that

22  you should write "█ percent" as the reasonable royalty rate,

23  at least █ percent; as the Court instructed you, that's your

24  starting point.

25       Now, the number -- the lines may be a little confusing,

1    but if you do █ percent, and you apply that to the almost --

2    it was a hair under, I think their sales were $1.596 billion,

3    as opposed to $1.6 billion, but if you apply that █ percent to

4    their sales, you are going to come up with a total damage

5    number -- which I submit to you, you should come up with -- of

6    ████████████.

7        And that, ladies and gentlemen of the jury, would

8    compensate Dr. Zebala for the fact that somebody took his idea

9    after all that hard work, and ignored him in 2000, ignored him

10   again when he went back in 2007; and it wasn't until he

11   finally was able to call them into court, to the one place

12   where a giant corporation and an individual are equal in our

13   country, that he was finally able to get an accounting for it.

14       And once they are here, and once they have to answer to

15   you, you shouldn't short change him.  You shouldn't give him

16   less than a full measure of justice.  And so you should go

17   with the full █ percent.  For every dollar that Illumina made,

18   they need to share, of that 80 to 90 percent of profit that

19   they make, they need to share ██████████████████.  That's

20   all.

21       And that, I submit, is a reasonable royalty that Syntrix

22   and Dr. Zebala and everyone that works there have waited a

23   long time to receive.

24       Thank you.

25           THE COURT:  All right.  I am now going to release you

1  to the jury room.  I think lunch should be waiting there for

2  you.  And you are now permitted, and required, to discuss the

3  case among yourselves.  And we will wait for your word.

4         THE CLERK:  All rise.

5     (Jury departed at 12:20 p.m. to begin deliberations upon a

6  verdict.)

7         THE COURT:  15 minutes, that's the -- I want you to

8  be within 15 minutes to respond to any questions we may get.

9  Of course, it could be the verdict.  But my primary concern

10  there is getting questions and being able to respond timely.

11         MR. GILLILAND:  Do we need to leave cell phone

12  contacts or anything with Gretchen?

13         THE COURT:  Yes, if you would.  And if you just have

14  a card, you can put it down there.  She went in to assist with

15  the lunch.

16         (Court in recess pending jury deliberations.)

17                        * * *

18         (In open court at 3:10 p.m. for verdict.)

19         THE CLERK:  All rise, Court is back in session.

20         THE COURT:  All right.  It has been reported that the

21  jury has reached a verdict.

22     What I will do is inquire as to who the foreperson is,

23  receive the verdict and ask if it is unanimous, and then I

24  will have Gretchen read the verdict.

25     Then I will ask her to poll the jurors to ensure that that

1  is not only the verdict of the jury but their individual

2  verdict.  If it appears to be inconsistent, then I will excuse

3  them into the jury room.

4          THE CLERK:  Please rise for the jury.

5      (Jury present.)

6          THE COURT:  Please be seated.

7      Has the jury reached unanimous verdict?

8          PRESIDING JUROR:  Yes, we have, Your Honor.

9          THE COURT:  If you would hand that to Ms. Craft, the

10 jury verdict, please.

11     All right, will you please read it?

12         THE CLERK:  We, the jury, unanimously agree to the

13 answers to the following questions and return them under the

14 instructions of this Court as our verdict in the case.

15     Question No. 1:  Direct infringement:

16     Has Syntrix proven by a preponderance of the evidence that

17 Illumina literally infringes any of the following claims of

18 U.S. Patent No. '682?

19     As to Claim 1:  1 micron BeadChip products:  "Yes."  Claim

20 125:  "Yes."

21     2 micron BeadChip products Claim 1:  "Yes."  Claim 125:

22 "Yes."

23     3 micron BeadChip products Claim 1:  "Yes."  Claim 125:

24 "Yes."

25     Question No. 2:  Indirect infringement - third-party

1   infringement:

2       Has Syntrix proven by a preponderance of the evidence that

3   Illumina's customers have directly infringed Claim 125 of the

4   '682 Patent?  "Yes."

5       Question No. 3:  Indirect infringement - contributory

6   infringement:

7       Has Syntrix proven by a preponderance of the evidence that

8   Illumina has contributed to the infringement by Illumina's

9   customers of Claim 125 of the '682 Patent?

10      1 micron BeadChip products Claim 125:  "Yes."

11      2 micron BeadChip products Claim 125:  "Yes."

12      3 micron BeadChip products Claim 125:  "Yes."

13      Question No. 4:  Indirect infringement - inducement of

14   infringement:

15      Has Syntrix proven by a preponderance of the evidence that

16   Illumina has induced Illumina's customers to infringe Claim

17   125 of the '682 Patent?

18      1 micron BeadChip products Claim 125:  "Yes."

19      2 micron BeadChip products Claim 125:  "Yes."

20      3 micron BeadChip products Claim 125:  "Yes."

21      Question No. 5:  Invention date - patent:

22      Has Syntrix proven by a preponderance of the evidence that

23   the invention date for any claim of the '682 Patent is prior

24   to December 1, 1998, the date the patent application was

25   filed?  "Yes."

1    Question No 6:  Rate date - patent claims:

2    What is the invention date for each asserted claim of the

3    '682 Patent?

4    Claim 1:  August 5, 1997.

5    Claim 125:  August 5, 1997.

6    Question No. 7:  Invalidity - anticipation:

7    Did Illumina prove by clear and convincing evidence that

8    any of the listed claims of the '682 Patent is invalid because

9    it is anticipated?

10    Claim 1:  Walt '540 Patent:  "No."  Walt '410 Patent:

11    "No."

12    Claim 125:  Walt '540 Patent:  "No."  Walt '410 Patent:

13    "No."

14    Question No. 8:  Written description requirement:

15    Has Illumina proven by clear and convincing evidence that

16    the specification of the '682 Patent does not contain an

17    adequate written description of any of the claims?

18    Claim 1:  "No."  Claim 125:  "No."

19    Question No. 9:  Damages:

20    If you have found that an Asserted Claim of the '682

21    Patent is infringed and not invalid, what amount has Syntrix

22    proved it is entitled to as a reasonable royalty?

23    Rate:  ▮ percent.

24    Total damages:  ▮▮▮▮▮▮▮

25    Signed March 14th, 2013, by the jury foreperson.

```
 1              THE COURT:  All right.  I am going to now ask
 2    Ms. Craft to ask each one of you if this is your verdict and
 3    the unanimous verdict of the jury?
 4              THE CLERK:  Juror No. 1, is this your verdict?
 5              JUROR NO. 1:  Yes.
 6              THE CLERK:  Is this the verdict of the jury?
 7              JUROR NO. 1:  Yes.
 8              THE CLERK:  Juror No. 2, is this your verdict?
 9              JUROR NO. 2:  Yes.
10              THE CLERK:  Is this the verdict of the jury?
11              JUROR NO. 2:  Yes, it is.
12              THE CLERK:  Juror No. 3, is this your verdict?
13              JUROR NO. 3:  Yes.
14              THE CLERK:  Is this the verdict of the jury?
15              JUROR NO. 3:  Yes.
16              THE CLERK:  Juror No. 4, is this your verdict?
17              JUROR NO. 4:  Yes.
18              THE CLERK:  Is this the verdict of the jury?
19              JUROR NO. 4:  Yes.
20              THE CLERK:  Juror No. 5, is this your verdict?
21              JUROR NO. 5:  Yes.
22              THE CLERK:  Is this the verdict of the jury?
23              JUROR NO. 5:  Yes.
24              THE CLERK:  Juror No. 6, is this your verdict?
25              JUROR NO. 6:  Yes.
```

1    THE CLERK:  Is this the verdict of the jury?

2    JUROR NO. 6:  Yes.

3    THE CLERK:  Juror No. 8, is this your verdict?

4    JUROR NO. 8:  Yes.

5    THE CLERK:  Is this the verdict of the jury?

6    JUROR NO. 8:  Yes.

7    THE COURT:  All right, the verdict will be filed.

8    I want to commend you, as the parties already have.  This

9    was a long trial.  It was certainly as complicated a trial as

10   one would expect to participate in.

11   If there was a medal of valor, I award each one of you

12   that for paying close attention and fulfilling your

13   responsibilities as jurors.

14   So with my deep appreciation and thanks, you are now

15   discharged.  If you like, you may stay after; the attorneys

16   may be interested in asking you some questions.  They cannot

17   ask questions about the details of your deliberations,

18   generally more about the overall conduct of the trial and how

19   you felt it went and that sort of thing.

20   You are certainly not required to, and neither are they,

21   under our local rule, permitted to contact you.  So you

22   certainly don't have to participate in any discussion with

23   them, and you are welcome to leave.

24   THE CLERK:  All rise.

25   (Jury departed at 3:20 p.m.)

1    THE COURT:  So then if you all -- you may be seated.

2  If you all wish to do as I indicated and participate,

3  generally what I will do is I will let the lawyers sit,

4  basically where you are sitting there, and the jurors, who may

5  want to participate, would sit back in the gallery there.  As

6  I said, it's important not to get into any kind of

7  deliberations.  It's a secret process, and so I will be

8  present as well to ensure that you don't go into areas that I

9  think are improper.

10   The Court anticipates motions; and we can, assuming the

11  motions are going to be made, will set up a briefing schedule

12  for that.  And we can probably do that before you leave today,

13  if you like.

14    MR. ROSENBAUM:  Your Honor, besides the briefing

15  schedule, there's a question of determining supplemental

16  damages through trial; and perhaps more importantly, the

17  timing of entry of judgment.  Typically that will occur after

18  a determination of supplemental damages.  We need to make sure

19  that we know there will be no immediate judgment entered,

20  given the post-trial matters to proceed.

21    THE COURT:  For appeal.

22    MR. ROSENBAUM:  For appeal, or for stay, whether we

23  need to move for stay of execution.  None of that is triggered

24  until after entry of judgment.

25    THE COURT:  Correct.  What is your proposal with

1   respect to the supplemental damages?

2           MR. ROSENBAUM:  We haven't talked about a mechanism

3   for doing that.  The briefing schedule, I presume, will be

4   done by the Court, perhaps through some -- again, a briefing

5   schedule.

6           THE COURT:  All right.  Let me do that.  I take it

7   the parties would like a briefing schedule that would

8   probably, on the supplemental damages, be over a period of --

9   I should think 30 days.

10          MR. GILLILAND:  Sounds reasonable to Syntrix, Your

11  Honor.

12          MR. ROSENBAUM:  I think we'll try to work out a

13  schedule.  They need supplemental information which we need to

14  gather.  It needs to be analyzed by two sides, experts

15  presumably.  There may not be disagreement on the math.

16          THE COURT:  Let's put it this way, no judgment will

17  be entered.  It sounds like to me the parties can agree to a

18  schedule here that would be likely satisfactory to the Court.

19          MR. ROSENBAUM:  And the question of -- obviously

20  central is the *Markman* issue and whether a monolayer is

21  permitted under the claim construction.

22      That could be briefed in post-judgment briefing, which

23  would technically require entry of judgment.  But perhaps

24  there's a more expedited way to proceed with that, whether

25  it's reconsideration of the Rule 50(a) motions or supplemental

1  *Markman* briefing.  It seems to me that's obviously a critical

2  question.

3      And I don't know if you are aware, Your Honor, as you've

4  heard the evidence whether they pushed it up to the top of the

5  hill or didn't push it up to the top of the hill; but

6  obviously that's a critical question.

7      There are others that are addressed in the motions, but

8  that's an all or nothing question.

9          THE COURT:  I understand, but I think that the

10  procedure should be as it routinely would be, and that is that

11  will be a post-judgment motion.

12     So that briefing schedule will trail the first.

13         MR. GILLILAND:  Your Honor, just briefly, I know that

14  we've talked about the Rule 50(a) motions on the record.  And

15  I know, to preserve their points, they did file their Rule

16  50(a) brief last night.  My understanding is that the Court

17  was just denying those, but I wanted to get clarification as

18  to whether we needed to respond to that or to consider it

19  denied.

20         THE COURT:  No, I think I denied that, so you don't

21  need to reply to that; but there will be a briefing schedule

22  with regard to the 50(b).

23         MR. GILLILAND:  I understand.

24         MR. ROSENBAUM:  As post-judgment briefing goes

25  forward, obviously we'll be seeking a stay of execution, if

1   there's not a stipulation, and the stay of execution without a

2   bond.

3        And I think particularly, in light of the critical *Markman*

4   issues, it would be appropriate.

5        We are not arguing it now, but it's kind of a head's up

6   for an issue that we are looking at down the road.

7             THE COURT:  All right, that will follow the entry of

8   the final judgment.

9             MR. ROSENBAUM:  Yes.

10            THE COURT:  Then that question, as well as the 50(b)

11  motions, will be briefed and determined.

12            MR. GILLILAND:  Nothing further from us, Your Honor.

13            THE COURT:  All right.  You probably gathered that

14  this Judge was at times overwhelmed by the complexity of the

15  technology.  I certainly feel I know it much better today than

16  I did before we began this trial.  And the fact that I do is a

17  tribute really to both parties here and the tremendous job

18  that each side did here in taking what remains a very complex

19  subject, even though you tried to describe it in opening

20  statements as really basically simple.  I never thought that

21  it was simple.  But you did a great job of bringing this

22  microbiology technology to a place where I think the jury was

23  able to understand it; and so I commend you, both sides, for

24  the work that you've done in connection with this case.

25            MR. ROSENBAUM:  Thank you, Your Honor.

1     MR. GILLILAND:  Thank you.

2     (Proceedings adjourned at 3:25 p.m.)

3

4

5                    *    *    *    *    *

6                  C E R T I F I C A T E

7

8     I certify that the foregoing is a correct transcript from

9  the record of proceedings in the above-entitled matter.

10

11  /S/  Teri Hendrix                 June 10, 2013

12  Teri Hendrix, Court Reporter           Date

13

14

15

16

17

18

19

20

21

22

23

24

25